## THOMAS S. WATERS, JR., vs. THE AMERICAN FINANCE COMPANY.

*Action by Vice-President of a Corporation to Recover Commissions for Making Sales—Authority of Secretary and Treasurer to Contract—Implied Agreement to Compensate Officers of Corporation for Services.*

This action was brought against a company by its vice-president to recover a sum alleged to be due under a contract between the plaintiff and the secretary and treasurer of the company, who was also its general manager by which the plaintiff was to receive one-half of the commissions on sales of certain shares of stock made either by the plaintiff as agent of the company or by the secretary and treasurer. Plaintiff's evidence tended to show that as agent he had effected certain sales of said stock. *Held,* that the plaintiff is not entitled to recover on the express contract set up, because there is no evidence that the secretary and treasurer of the defendant was authorized to make such contract, or that it had been ratified by the defendant, and there is no presumption that the secretary and treasurer of a corporation has power as such to make a contract like the one sued on with the vice-president of the company.

*Held,* further, that if it be found that the plaintiff's services in selling the stock were outside of his duties as an officer of the defendant company, he is entitled to recover reasonable compensation therefor under a *quantum meruit.*

Appeal from the Baltimore City Court (WRIGHT, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*F. V. Rhodes* (with whom was *C. C. Rhodes* on the brief), for the appellant.

*D. Eldridge Monroe,* for the appellee.

BOYD, J., delivered the opinion of the Court.

This is an appeal from the judgment in the short note case in an attachment proceeding instituted by the appellant against the appellee. The short note contains the common counts and the account filed is for "12½ per cent commissions on the sale

of 3,500 shares of the Giroux Consolidated Mines Company's stock to Mr. and Mrs. F. P. Center, Brooklyn, N. Y., at $5.00 per share, $2,187.50 less amount paid $135," leaving a balance of $2,052.50 alleged to be due. The appellee is sued as "a body corporate," but it is not stated where it was incorporated or what powers it possessed, although the appellant testified it was organized to sell coal and timber lands and unlisted stocks and bonds. He said that a Mr. Maegher, of Richmond, Va., was president, he (the appellant) vice-president, and Mr. Beveridge, secretary and treasurer, and he added "but Mr. Beveridge was the man behind the gun of the company." Those three officers and Mr. Berner, of Mt. Washington, were directors, and each of the three had three thousand shares of preferred and three thousand of common stock, of the par value of $1 per share. Mr. Berner and a Mr. Lawrence, of Dakota, also held some stock. The Giroux Company agreed to pay 25 per cent commissions to the appellee for sale of its stock, at $5 per share. The appellant claims that he made an agreement with Mr. Beveridge by which he "was to receive one-half of the commissions accruing from the sales of all Giroux stock either sold by Mr. Beveridge, as secretary and treasurer of the American Finance Company, or myself as its agent." That was in Baltimore, but after the fire there in February, 1904, he went to New York and was to be paid his expenses, in addition to his commissions. Before he went to New York he sold ten shares to one person, and there was a sale by Beveridge of one hundred shares to Mrs. Center—the commissions upon which he said he received one-half, and "*Mr. Beveridge got half.*"

On March 21st, 1904, he claims to have sold to Mr. and Mrs. Center, who were then in Boston, thirty-five hundred shares for $17,500—$3,000 cash and the balance to be paid in 90 days. He admits that their subscription included one thousand shares which Mrs. Center had ordered through the appellee. On the face of the subscription, which was in writing, addressed to the Giroux Company, there was an endorsement that it included all previous subscriptions made through the American

Finance Company during the month of March, 1904. The $3,000 was drawn from some savings institutions by the appellant for Mrs. Center, and paid over to the Giroux Company, and afterwards $6,500 was paid to that company through him, and the balance to the appellee (through Beveridge), for the Giroux Company.

At the conclusion of the plaintiff's testimony the Court below granted a prayer "That there is no evidence legally sufficient to show that the plaintiff was employed by the defendant to act as the agent or servant of the defendant in procuring purchasers for the stock mentioned in the evidence, and the verdict of the jury must be for the defendant." An exception to that ruling is the only one presented by the record.

This case is certainly a peculiar one. Apparently the principal business actually done by the appellee was the sale or attempted sale of Giroux stock—of which it seems to have been authorized to sell thirty thousand shares, but, so far as shown by the record, it sold less than four thousand shares, including those to Mr. and Mrs. Center. Yet we find the appellant, who was the vice-president, a director and a large stockholder, demanding more than one-half the appellee was to receive, as he was to get one-half the commissions and his expenses. If we take this statement literally, Mr. Beveridge, the secretary and treasurer, was to receive the balance, but assuming that he meant that Mr. Beveridge was to receive it for the appellee, does the record show such facts as would entitle the appellant to recover against the appellee?

The appellant cited a number of authorities concerning the powers of officers and agents of corporations, ratification by the corporations of their acts, etc., but here we have a vice-president and director (not to refer to his being a large stockholder) who presumably knew, and certainly ought to have known, the powers of the officer of the company with whom he was dealing. There is no excuse for his not knowing, and, if he did, he was surely under obligation to furnish more evidence of the powers of Mr. Beveridge than appears in the record. Without some affirmative proof that the

secretary and treasurer of the company was authorized to give him, not only one-half of the commissions on sales of this stock made by him, but according to his testimony one-half of the commissions on all sales of this stock, whether made by him or not, in addition to his expenses, he should not be permitted to recover from the company on such a promise.   There is no presumption of law that one who is secretary and treasurer of a corporation has such power, and merely because the appellant spoke of Mr. Beveridge as "the man behind the gun," or even as "general manager," is not sufficient unless there be more than we have in this record to inform us of the nature of his duties and the extent and character of the business of the company he was representing. The office of general manager in many corporations is one of very large powers, but so far as we are informed Mr. Beveridge seemed to have had but little to manage.   The appellant testified "there were no other agents in the employ of the American Finance Co. but myself," and up to the time he went into the employ of the company no timber or coal lands had been sold, and it is not shown that any were afterwards sold.   There is nothing to inform us what the president did or was supposed to do, and there is no intimation that he ever approved of, or even knew of the alleged arrangement between the appellant and Beveridge.   Nor is there the slightest suggestion that the board of directors had authorized it, or that any member thereof, excepting Waters and Beveridge, knew that they were thus entering into an agreement by which one of them was to get more than one-half of the profits coming to the company from the sale of this stock, which, as we have already said, seems to have been its principal business—certainly up to the time Waters claims to have been employed.   He was in the employ of the appellee according to his claim for less than three months, yet if they had succeeded in selling the thirty thousand shares of stock he would have been entitled to one-half of $37,500, as his share of the commissions.   Well might Beveridge say to him in one of the letters, offered by appellant: "You know that 30,000 shares

means $37,500 *for us,* and *we* don't want to lose this great opportunity."

One circumstance disclosed by the testimony is very remarkable, in view of the fact that the appellant seemed desirous of giving the impression that Beveridge was "the company practically." The subscription to the stock of the Giroux Company by Mr. and Mrs. Center is dated March 21st, 1904, yet on March 22nd, he got from the Giroux Company what is spoken of as a due bill, which reads: "Due to Mr. Thos. S. Waters, Jr., as vice-president of the American Finance Company, of Baltimore, Md., $4,375.00 as commission on the sale of thirty-five hundred (3,500) shares of stock of this company, upon the payment by the subscriber, Mrs. Helen C. Center, of the balance of $14,500 due upon the said subscription, $3,000 having been paid by the subscriber to apply on the subscription as an incentive for this company to hold the same." If Beveridge had such powers as the appellant would have us believe, and he, as vice-president, had none, upon what possible theory could he justify his conduct in taking the due bill in that form? Under no circumstances was he entitled to more than one-half of the commissions (in addition to his expenses), and the treasurer was entitled to collect all of them. The Giroux Company owed the appellee whatever commissions were due by the former, and it had no right to pay them to the appellant. He did collect $135 when he turned over the $3,000 for Mrs. Center, and when asked whether he had any authority to collect any money for the appellee he replied: "I had no absolute authority in writing, but as vice-president of the American Finance Company I drew this $135 and reported it to the American Finance Company at the time I enclosed the report of sale." It is not shown just when it was, but apparently sometime after Waters had ceased his connection with the appellee as agent, Mr. Kennedy, treasurer of the Giroux Company, got the due bill from him, and turned it over to Beveridge. In a letter written to the Giroux Company by Beveridge on March 23rd, 1904, which was offered in evidence by the appellant, Beveridge said that appellant was sent to

New York "by the writer at the writer's personal expense to sell the stock of your company. He failed to sell the stock and was requested to come home two weeks ago." He stated in that letter that appellant had not sold one dollar's worth of the stock, and that "Mr. Waters was employed temporarily as an agent only and he is not authorized to receive the company's money. He was not requested to spend *my* money to go to Boston, and he has been acting contrary to my wishes for the past ten days." He indignantly denied the right of the Giroux Company to give Waters "any due bills issued by you or by your company for any so-called commissions on account of this company." Just why that letter was offered by the appellant is not clear, but he admits that he saw it the day it was received by Mr. Giroux, and then went into the employ of the Giroux Company. He also admits that Beveridge had notified him before he visited the Centers at Boston, that he thought it would be well for him to come back to Baltimore. It is therefore, to say the least, very doubtful whether the appellant had not been discharged by Beveridge before the subscription of stock was made by the Centers.

But without regard to that, is the plaintiff entitled to recover on this *express* contract, as it is alleged to be? To permit two officers, who were also directors of the corporation, to make an arrangement or contract so questionable, if not manifestly inequitable as this, without clear and unquestioned authority on the part of the one undertaking to bind the company, would establish a precedent which would be most dangerous. It is true that in this State an officer or director of a corporation can recover for services rendered his corporation, even if the services for which he claims compensation are within the line and scope of his duties, as such officer or director—*provided* he proves an *express* contract, and that if he renders services which are not within the scope of and are not required of him by his duties as such officer or director, but such as are properly to be performed by an agent, broker or attorney, he may recover compensation for such services upon an *implied* promise. *Santa Clara Mining An.* v. *Meredith,* 49 Md. 389. But in

this case there is no evidence or pretence that anyone connected with the company had any knowledge or intimation that such an arrangement had been made, excepting Beveridge, and his powers to employ agents or fix their compensation, or bind the company in other ways, are left utterly uncertain and indefinite in the evidence—too much so to justify recovery by one connected with the company, as appellant was, on such a remarkable agreement as the one relied on.    It might require less evidence to sustain a claim by a stranger, but the appellant's connection with the company was such as to give him full information as to the powers of Beveridge, and he could not be imposed on or deceived by an apparent authority, even if it be conceded there was such, which cannot be done.   There is nothing to show a ratification by the company of the alleged contract for whatever was done was by Beveridge, and of course he could not ratify his own acts—if he had power to ratify them he had power to act in the first place, and there would then be no necessity for ratification.   We are therefore of the opinion that the appellant failed to show such authority in Beveridge as was necessary to support the action on the alleged *express* contract.

But although we so find as to the alleged contract set out in the account, we are of opinion that there was error in granting this prayer.   There was evidence tending to show that the appellant did sell at least 2,500 of the 3,500 shares of stock to Mr. and Mrs. Center—included in the subscription we have spoken of.    It is further shown that the appellee actually had in hand at least $5,000 of the money of the Giroux Company for stock sold Mrs. Center, and in a statement written on the back of a check of the American Finance Company, dated April 11th, 1904, payable to the Giroux Company, it credited itself with the commissions on the sale of the 3,500 shares of stock.    If then the appellant did sell part of that stock, as he claims he did, and the appellee has in hand the fruits of the labors of the appellant, it would seem to be just that he should receive such compensation as may be found to be reasonable for any services thus rendered by him outside of his duties as

vice-president or director. There is nothing in the record to show that the sale of the stock was a part of his duties in either of those capacities, and it certainly could not have been required of him to go to Boston for such purpose. He received no compensation as vice-president or director and these services were such as an agent, attorney or broker might perform. He would therefore be entitled to recover compensation on the *implied* promise to pay for these services, which resulted in the appellee's receiving commissions on the sales of at least 2,500 shares of this stock, *provided*, of course, the jury believed his statement to be correct. *Meredith's case, supra.*

The Court ought to have submitted these questions, including the value of appellant's services to the jury, for although we are of opinion that there was not sufficient evidence of the authority of Beveridge to make such a contract as that spoken of in the first part of this opinion, that would not preclude the appellant from recovering for services *actually rendered and accepted by the appellee* by the receipt of the commissions on stock sold by the appellant—not in the line of his duties as vice-president or director. As the granting of the prayer prevented the jury from passing on those questions, the judgment will be reversed.

*Judgment reversed and new trial awarded
—the appellee to pay the costs.*