# THE CONSERVATION COMPANY

## *vs.*

## HERBERT B. STIMPSON.

*Common  Counts—Corporate  Officer—Authority—Employment
of Broker—Purchase of Other Company—
Evidence—Instructions.*

Common counts may be joined with a special count on an
express contract.                                                   p. 317

There may be a recovery under a common count when there
is a special contract, provided the plaintiff has performed his
part of the contract, and nothing remains but to collect what
is due by the defendant.                                            p. 317

The alleged contract being verbal, it was for the court, sit-
ting as a jury, to find whether there was a contract, and if so,
what it was.                                                        p. 320

On an issue as to whether the president of an insurance
company had authority to conduct negotiations for the pur-
chase of the capital stock of another company, *held* that there
was sufficient evidence of such authority to be submitted to the
court sitting as a jury, in the shape of minutes of meetings of
the board of directors, referring to such negotiations, and di-
recting their continuance, the acceptance by the board of the
president's final report thereon, and the subsequent formal di-
rection to the officers to consummate the purchase.  pp. 319-327

If the president of a corporation is given authority for a
particular purpose, such as the purchase of property, he may
make a binding agreement on behalf of the corporation to pay
another for assistance in carrying out that authority, provided
such employment of another is reasonably necessary, and that
there is no express authority to that effect, or any ratification
of the particular agreement, is immaterial.                        p. 328

One employed by a corporate officer to aid in carrying out a
purchase authorized by the corporation is entitled to recover
a reasonable compensation for his services, not exceeding what
he claims was the amount agreed on.                                 p. 329

For the purpose of prayers seeking to have an instructed ver-
dict for the defendant, the evidence of plaintiff must be as-
sumed to be true.                                                   p. 327

Syllabus.

The defendant having refused to consent to a proper modification suggested by the court of a prayer which it had offered, the court's action in refusing the prayer instead of granting it with the modification was not reversible error.     p. 329

Where a corporate officer was authorized to make a certain purchase, and it was reasonably necessary and proper, as a part of the transaction, to employ another to assist him, the subsequent ratification of the purchase as made carries with it the duty on the part of the corporation to compensate the person so employed.     p. 328

That one authorized by a corporation to make a purchase misleads the board of directors as to the commissions to be paid to another assisting therein, or fails to inform the board of directors in regard thereto, does not affect the latter's right to recover such commissions.     p. 330

In an action against a corporation to recover commissions, it was proper to show that the person who employed plaintiff occupied the offices of the company, and in what capacity he was there.     p. 331

On an issue as to the authority of the president of a corporation to conduct negotiations for the purchase of the capital stock of another company in the same line of business, and to contract to pay commissions to one assisting him in such negotiations, it was proper to show that the vice-president was conducting like negotiations as to the stock of a third company, and that he inquired of the president whether commissions would be paid in connection with these latter negotiations, this tending to show how the president was regarded by the directors and other officers, and what the custom of the company was.     p. 331

Code, Vol. 4, Article 23, Section 186A, providing, in regard to insurance companies, that the cost of promotion, including commissions to the stock salesmen and all expenses of organization, shall not exceed five per centum of the subscription or selling price of each share of stock, constitutes no defense to a claim against a company in excess of five per cent. of its total capital stock, for commissions agreed to be paid to a broker for securing for the company, by purchase, the capital stock of another company.     p. 330

In an action against an insurance company for commissions by one employed by it to acquire by purchase the stock of another company, *held* that the company could not defend on the ground that a judgment for plaintiff would increase the liability of those who guaranteed the payment by defendant of the purchase price of the stock, the guaranty not being so framed as to make the guarantors liable for such commissions.                                                                        p. 331

What defendant's president promised to pay plaintiff, if anything, cannot be shown by the testimony of the plaintiff's associate that what he and plaintiff had agreed upon as the proper commission was said by plaintiff to have been approved by the president, this being hearsay.                        p. 333

There being a conflict as to a material issue between the two principal witnesses, the fact that the court, sitting as a jury, regarded as admissible certain evidence bearing on this issue which was properly inadmissible, *held* ground for reversal.

p. 333

*Decided March 17th, 1920.*

Appeal from the Baltimore City Court (AMBLER, J.).

The cause was argued before BOYD, C. J., THOMAS, URNER, STOCKBRIDGE and ADKINS, JJ.

*Jacob S. New* and *Joseph C. France,* with whom was *Julius H. Wyman* on the brief, for the appellant.

*Frank Ober* and *Stuart S. Janney,* with whom were *Janney, Stuart & Ober* and *R. Lee Slingluff* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is a suit by the appellee against the appellant to recover commissions for services rendered in the purchase by the appellant of the capital stock of the Eureka Life Insurance Company of Baltimore City, which he claims he was employed to procure. There are six common counts and one on a special contract in the declaration. The suit was brought under the Practice Act of Baltimore City, and the account attached to the declaration was for "commission

earned at an agreed rate, 2½% of $460,000 for services ren-
dered in the purchase by the Conservation Company of 1,000
shares of the capital stock of the Eureka Life Insurance
Company of Baltimore City for $460,000 * * * $11,500.00."
General issue pleas were filed, and the case was tried before
the Court without a jury. A verdict was rendered for the
plaintiff for the amount claimed, and an appeal was taken
from a judgment entered thereon. There are seventeen bills
of exception on the rulings on the admissibility of evidence,
one presenting the rulings on the prayers, and a separate one
on the action of the Court in overruling special exceptions
to the plaintiff's prayer:

1. Inasmuch as the appellant contends that the appellee
cannot recover under the common counts, it will be well to
first consider that. In the brief it relies on what was said
in *Bethlehem Steel Co. v. Dornberg,* 135 Md. 121. It was
there said that, "The first three counts in the declaration
were the common counts in assumpsit, on an implied contract,
while the fourth count sets out a specific contract; and it
needs no citation of authorities for the proposition that a
plaintiff cannot recover in the same suit upon both an im-
plied and express contract." Of course, a plaintiff cannot
recover in the same suit upon, *both* an implied and express
contract, for the same transaction, and in that case the plain-
tiff relied on an express contract. There can be no question
in this State about the right to join common counts with a
special count. It is said in 1 *Poe,* Sec. 583: "In assumpsit,
a careful pleader, when declaring on a special contract, sel-
dom omits the common counts." Under our established prac-
tice there can be a recovery under the common count ap-
plicable, where there is a special contract, provided the plain-
tiff has performed his part of the contract, and nothing re-
mains but to collect what is due by the defendant. Some-
times the plaintiff cannot prove the contract just as he al-
leges it in his special count, and hence the pleader will join
common counts with it. When the alleged contract is a ver-
bal one, as the one before us was, he may be able to prove

that he was employed and had performed the services, but may fail to show to the satisfaction of the jury that the defendant agreed to pay the compensation he alleged was agreed upon, or may fail in proving some other part of the contract as alleged. It was said by our predecessors as early as *Speake* v. *Sheppard,* 6 H. & J. 81, that: "It is unquestionably true, that when a party declares upon a special agreement, and proves a contract variant from the one on which he does declare, he cannot recover on the special contract, on account of the variance, nor can he recover on a *quantum meruit,* because there was a special contract; but if he declares upon a special contract, and fails to prove it, but proves an agreement, and the work done according to the terms of it, it raises a duty for which a general *indebitatus assumpsit* will lie. *Bull,* N. P., 139, 140; *Payne* v. *Bacomb,* 2 Dougl. 651." In *Payne* v. *Bacomb* the trial Court refused to let the plaintiff offer evidence under the general counts, and directed a non-suit. On appeal that was reversed, and LORD MANSFIELD said: "This was formerly the rule, when the fashion was to lay hold of a non-suit whenever it could be done." In *Speake* v. *Sheppard* there were three counts, the first upon the special agreement, the second upon a general *indebitatus assumpsit* and the third upon a *quantum meruit.* It was originally held that there could be no recovery under the *indebitatus assumpsit* counts, unless a promise to pay a specific sum was shown, and hence the *quantum meruit* and *quantum valebat* counts were resorted to, but the rule as to *indebitatus assumpsit* counts was long since abandoned in Maryland and the *quantum meruit* and *quantum valebat* counts "fell into complete disuse," while to the common counts now used "the name of *indebitatus assumpsit* counts strictly belongs." 1 *Poe, Pl. & Prac.,* Sec. 91.

There are so many cases in this State showing the practice and use of joining common counts with special ones, that it is unnecessary to refer to many of them. The cases of *Fairfax F. M. & M. Co.* v. *Chambers,* 75 Md. 604, and *Gill* v.

*Donovan,* 96 Md. 518, state fully and clearly what can be proven and recovered under the common counts, even where there is a bill of particulars which shows that there was a special contract. In each of those cases the alleged contract was verbal, like the one in this case, and the bill of particulars is very similar to this one. Although there does not seem to have been a demand for a bill of particulars, as this suit was under the Practice Act, the account filed with the declaration took the place of a bill of particulars, under Sec. 24, Subsec. 107 of Art. 75 of 3rd Vol. of Code. If the common counts are to have the effect given them in those cases, when they are not joined with a special count, we can see no reason why they should not have the same effect when they are so joined. See also *Dougherty Co.* v. *Gring,* 89 Md. 535, where the subject was discussed by JUDGE McSHERRY, in a case where there were common counts and a special one. It does not follow, therefore, that the question of implied *assumpsit* was eliminated in this case, as the appellant contended.

2. The next question we will consider is the contention of the appellant that John C. Maginnis had no authority, express or implied, to purchase for the appellant the capital stock of the Eureka Life Insurance Company, and, therefore, could not make a contract to pay a commission for its purchase. The appellee claims that Mr. Maginnis, who was at the time the president of the Conservation Life Insurance Company, employed him to procure that stock for the appellant, and promised to pay him 2½ per cent. commission for his services, part of which he was to give Mr. G. W. S. Musgrave for the services to be rendered by him. There was an unfortunate conflict between the appellee and Mr. Maginnis as to compensation, the latter denying positively that he ever made such an agreement and contending that Mr. Stimpson, the appellee, who was the secretary of the People's Life Insurance Coupon Company, took the part he did concerning the purchase of the Eureka stock because they were considering

an arrangement which would greatly benefit the Coupon Company, if the appellant could buy a going life insurance company. We are not called upon to pass upon the question of fact, as to whether such an agreement was made between them, but, assuming that it was, to determine on this point whether Mr. Maginnis had the power to make it, as that lies at the foundation of plaintiff's right to recover under the alleged agreement.

It cannot be doubted that Mr. Stimpson was actively engaged in aiding Mr. Maginnis to acquire the Eureka stock. As the alleged contract was verbal, it was for the judge, sitting as a jury, to find whether there was a contract, and, if so, what it was. It is shown by both sides that Mr. Stimpson's connection with the negotiations for the Eureka stock began in the early part of June, 1918, and continued at intervals in July, August and September, into October. The deal was finally closed by a written agreement between the Conservation Company and Messrs. Coblentz and Hall, agents and attorneys, dated December 3, 1918. It was in September that Mr. Stimpson claims that the amount of commission was fixed, prior to that time it being simply agreed that he was to be paid reasonable compensation for himself and Mr. Musgrave, without naming the amount. Then he testified that about three weeks before the closing of the transaction in December Mr. Maginnis told him how he was arranging to finance the commissions, and about November 26th told him that they had arranged for the money, and that the commissions were in shape to be paid. A day or two after the deal was closed he asked Mr. Maginnis what arrangements they had made about the commissions, and was told that the money had been paid to the Eureka stockholders and that he should collect it from them.

As we have seen, the position of the appellant is that John C. Maginnis had no authority, express or implied, to purchase the Eureka and, therefore, could not make a contract to pay a commission for its purchase. But we cannot hold that

there was not legally sufficient evidence to be submitted to the Court, sitting as a jury, as to the premise upon which the appellant's conclusion is based. Mr. Maginnis was not only the president of the company until some time in October— Mr. Mahool having been elected at the meeting of October, 24, 1918—but he is spoken of in at least one place in the record as president and manager. It is shown that the stockholders and directors of the Conservation Company early determined that the proper policy to be adopted was to acquire a going life insurance company, and there can be no doubt that Mr. Maginnis was the active and controlling person in carrying that out. He testified that "Many of our men on our board were not familiar with life insurance terms and had to have those things explained, so at these conferences we had to show them where we arrived at value." It cannot be contended that nothing was done showing his authority, excepting what appears in the minutes of the board. He said, in speaking of the conference that resulted in agreeing upon a price for the Eureka, that he was not sure whether it "was a directors' meeting or a conference of stockholders. They had so many of those conferences; but there was a committee appointed consisting of Messrs. Mahool, Schloss and the witness to meet the stockholders of the Eureka Life Insurance Company." Mr. Mahool testified that Mr. Maginnis reported, "either to the board or those conferences that were held in the office of the company, and they would call a board of directors' meeting when they had something very definite to bring before the board"; that after there was some likelihood of the negotiations going through, the board appointed him and Mr. Maginnis a committee to carry them through. The record discloses that the officers were negotiating with at least three companies, and had been for some time—with one as early as February—but there were no results excepting with the Eureka, which apparently came about through the services of Mr. Stimpson.

At a meeting of the board on June 19, 1918, a communication was read from a Philadelphia company, giving details as to plans for purchasing control, and the chairman was authorized to appoint a committee on permanent organization. Stimpson had told Maginnis about June 1st that Musgrave was the one who could approach the stockholders of the Eureka, and that in order to get him interested he would have to be able to tell him that a reasonable commission would be paid witness, so that he could tell him that he (Musgrave) would receive a portion of what the Conservation Company paid him; that Maginnis told him to see Musgrave at once and tell him that a reasonable commission would be paid, if they succeeded "in putting the matter across." He saw him that day, explained it to him and Musgrave promised that he would take the matter up and report to him. Two days later he was called over the telephone by Musgrave and taken to Mr. Hall, who had offices with Musgrave and was a stockholder in the Eureka, and went over the matter with him. By appointment Stimpson took Maginnis to Mr. Hall on June 6th, introduced them and the negotiations began. Owing to the fact that Mr. Hall was away on Government business, Stimpson did not get to see him again until July 30th, when he made an appointment for Mr. Hall to meet Mr. Maginnis on August 8th. After a conference of several hours between them, Mr. Hall said he would take it up seriously with Messrs. Coblentz and Cover, the principal stockholders of the Eureka. The appellee saw Hall on the 13th of August, who said progress was being made, and about September 3rd or 4th he and Maginnis again saw Hall, who arranged for Messrs. Coblentz and Cover to be in his office on September 6th. At that meeting the price was fixed, and the deal finally went through. On July 17, 1918, there was a meeting of the board, and the following appears in the minutes:

"Mr. Mahool reported on the progress made in negotiations for the purchase of a going life insurance com-

pany, stating that the negotiations with one certain company in town were progressing to the closing point, that he had an appointment this evening with one of the principals. It was the sense of the meeting that the officers continue this work and keep up the negotiations with the three companies mentioned, closing with the first of the three offering the best advantages to this company."

It may be inferred that the Eureka Company was one of the three referred to, and it may have been the one referred to, "that the negotiations with one certain company in town were progressing to the closing point." When Mr. Mahool reported on the progress made in the negotiations, can it be doubted from the language used that the directors had been previously informed of the negotiations, and that Mr. Mahool and Mr. Maginnis were authorized to conduct them? If there can be any doubt about that, at that meeting *"the officers"* were authorized, not to say directed, *to continue the work,* etc. Later the conferences with Mr. Hall were held, and finally the one on September 6th with Messrs. Coblentz, Cover and Hall. On August 21st Mr. Mahool reported to the board the details of his negotiations with regard to the purchase of the Sun Life Insurance Company, and "Mr. Maginnis made a report on the developments and progress of negotiations with the Eureka." At that meeting a resolution was adopted, which began with the preamble that "Whereas, the Conservation Life Insurance Company has been given an opportunity to purchase the Eureka Life Insurance Company of Baltimore, and negotiations are pending with certain other companies of this city", etc., and went on to provide for a change of the name to "The Conservation Company" and to alter the purposes and powers of the company, to be stated in a proposed amendment of the charter. That was adopted by the stockholders on September 24th, and fifteen directors, including Mr. Mahool and Mr. Maginnis were elected. At a meeting of the board on October 3rd

temporary officers were chosen, and on October 24th Mr. Mahool was elected president, and Mr. Maginnis vice-president. On November 20th the minutes show, amongst other proceedings, that:

> "In behalf of the committee appointed at the last meeting, and authorized to negotiate for the purchase of the Eureka Life Insurance Company, the vice-president, Mr. J. M. Maginnis, made a verbal report, stating *that* had been accomplished, and submitting a copy of the statement given committee by the Stockholders' Committee of the Eureka."

The report was accepted, the committee discharged, and it was unanimously resolved:

> "That the officers be and they are hereby directed to purchase the Eureka Life Insurance Company at and for the sum of $460,000; to arrange for a loan of such sum or sums of money as may be necessary to pay for same, and to issue the promissory note of the company for deferred payments or for all or any part of said purchase price, and to do all acts and things necessary to secure the control of the said Eureka Life Insurance Company to the Conservation Company."

On December 5th a meeting of the board was held, a report "of the officers" was accepted, the terms and conditions of the agreement approved, and a copy ordered to be placed in the files of the company. A resolution was also passed "that the officers be authorized to make whatever arrangements with the banks that in their judgment they deem necessary toward the fulfillment of our agreement with the Eureka."

It will readily be seen from what we have thus set out at some length that the authority granted Mr. Maginnis was not confined to the powers the charter and by-laws gave him, in defining the duties of the officers of the president and vice-president, but his authority was sufficiently authorized and ratified by the Board of Directors at their meetings to require that to be submitted to the Court, sitting as a jury.

We could not hold, under the minutes alone, that there was no evidence of his authority, but the circumstances and facts in connection therewith make it clear that there was ample evidence to be submitted. While they speak of *"the officers"* in connection with the negotiations, the testimony of Mr. Maginnis and of Mr. Mahool shows that the former was really *the* officer who conducted the negotiations for the Eureka, as Mr. Mahool was *the* officer who conducted them with the Sun Life, although the latter employed other people to carry them on. Mr. Maginnis had conferences from time to time with the other stockholders and officers, and there were evidently some meetings of the executive committee, if not of the directors, which do not appear in the minutes. The executive committee consisted of the president, vice-president, secretary, treasurer and one member selected from the board, and three of the number constituted a quorum for the transaction of business. That committee had "the power and authority, when the Board of Directors is not in session, to do and perform such acts and duties as the Board of Directors does, or can possess by virtue of the acts of incorporation or by virtue of these by-laws, or any laws of this State."

While there is conflict of testimony as to the commissions, there is none of importance as to the dealings with other companies, and if a corporation is to escape liability on the ground that its president, or vice-president, had no authority to act under such evidence as there is in this record, it would open the door to all kinds of fraud, and would cripple the transactions of the corporations themselves, as no one could have any confidence in his right to deal with such officers, if he could not under such facts as we have before us rely on their authority. Mr. Maginnis testified that he "delegated Mr. Mahool to take care of one company, he remembers, and the witness was in negotiation with another one." He also said that he "discussed everything very openly and freely with Mr. Stimpson as to the plans. Mr. Mahool was very

active too." Mr. Mahool, at first vice-president and afterwards president, testified that he "had heard that Mr. Stimpson had been consulting with Mr. Maginnis and the witness knew that Mr. Stimpson had something to do with it, but the witness did not know what."

Again, he said: "The witness knew that there had been some conferences between Mr. Maginnis and Messrs. Musgrave and Hall. The witness never asked Mr. Maginnis how he came to this association; but nevertheless the witness knew that Mr. Stimpson was around this transaction in some way or other, and the witness did not make any particular inquiry as to what Mr. Stimpson's object was; the witness had lots of other things to think about."

He further testified that he knew of negotiations for the Eureka about the first of June which resulted in the purchase, that "Mr. Maginnis was concerned in that more particularly than the witness was; the witness was concerned in it, but the witness means to say that it was carried through largely by Mr. Maginnis, and the witness was called into it in a definite way in September, when he was appointed on the committee to confer with Messrs. Cover, Coblentz and Hall."

He also testified: "Mr. Stimpson's activity in the matter had been sufficiently pronounced to call the witness' attention to the matter, and the witness asked Mr. Maginnis what Mr. Stimpson was getting out of it, and Mr. Maginnis told the witness Mr. Stimpson was being paid by the other side."

In passing it may be said that it is difficult to reconcile that statement of Mr. Maginnis to Mr. Mahool with his evidence that he thought Mr. Stimpson was doing all he did on account of his desire to have the Coupon Company connected with the Eureka Company, if the appellant purchased it. It is remarkable that Mr. Mahool, the president of the Coupon Company, did not seem to have such an understanding. Mr. Maginnis testified that Mr. Stimpson was in his office back and forth between Mr. Mahool and himself frequently, that

he was there most every day and several times a day, "and always there was a message between Mr. Mahool and the witness or somebody else."

Of course, we do not suppose that Mr. Maginnis was not to report back to the board, when in session, before the sale was actually consummated. It had to be financed and some record made of the purchase, besides formally approving of it, but there was ample evidence to show that he was authorized to carry on the negotiations. He could not have made a final report for the approval of the board without the preliminary negotiations, and we have seen above the express authority that was given by the board, and the action taken by it, which necessarily implied previous authority. Mr. Stimpson was still working at Mr. Maginnis' instance when some of the actions spoken of were taken by the board, and continued to do what Mr. Maginnis requested until the deal was agreed upon.

3. The only possible doubt we have had was, conceding the above to be so, whether Mr. Maginnis has authority to bind the company for compensation to Mr. Stimpson, and we have reached the conclusion that there was sufficient evidence of that to go to the Court, sitting as a jury. Although the other officers and directors seem to have known nothing about the compensation, it was what they had the right to assume would, or at least might be the result of the efforts of Mr. Maginnis. For the purposes of the prayers seeking to have an instructed verdict for the defendant, we must assume the evidence of the plaintiff to be true. With that assumption, if the others were kept in ignorance by Mr. Maginnis, and he deceived them, that would be no reason for relieving the company of its liability to the plaintiff for his services. He was not a stockholder in the Conservation Company, as Mr. Mahool was, and according to Mr. Maginnis he was a man of limited means. Mr. Maginnis knew that the Eureka people did not care to sell, as Mr. Hall said so, and no one in the interest of those stockholders approached Mr. Maginnis, or any one connected with the Conservation Company.

We find nothing in any of the Maryland cases cited by the appellant to the effect that if the president of a company has authority to do something, such as purchasing property, he cannot employ and make a binding agreement to pay others for services rendered in that connection, and the other authorities cited are not persuasive, to the extent necessary to defeat the appellee, under the circumstances of this case. *Hadden* v. *Linville*, 86 Md. 210; *Waters* v. *Am. Finance Co.,* 102 Md. 212; *Carroll* v. *Manganese Safe Co.,* 111 Md. 252; and *Moore* v. *Councilman,* 115 Md. 629; cited by the appellant, certainly do not go that far. But in the case of *North. Gen. Ry. Co.* v. *Bastian,* 15 Md. 494, it was held that, the acting president being empowered to sell the iron in question, it was competent for him to engage the services of the plaintiff to aid in finding a purchaser, and bringing about the sale. That case has never been questioned by our later decisions, and seems to us to be the just and the proper rule. In *Waters' Case, supra,* it was held that although the plaintiff, who was an officer of the company, could not recover under the special contract he set up, he was entitled to compensation for his services. As reflecting somewhat upon the general question, although not wholly applicable, see 3 *Fletcher Cyc. of Corp.,* Secs. 2002, 2012, 2037; *Henderson* v. *Raymond Syndicate,* 183 Mass. 443; *Dillard* v. *Olalla Mining Co.,* 52 Or. 126; *Edelhoff* v. *Horn-Miller Co.,* 86 Md. 595, 609-610; *Grape Sugar & Vinegar Co.* v. *Small,* 40 Md. 395, 400.

We think that the defendant's first, second, fifth, sixth, seventh, ninth and eleventh prayers were properly rejected, and we find no error in the plaintiff's prayer. The defendant's fourth was properly rejected. As we understand it, the theory of it is that in order for the plaintiff to recover there must have been an express authority for Maginnis to promise or undertake for the company that it would pay the compensation, or a ratification or adoption of the particular agreement for commissions. If the Court sitting as a jury found

that Maginnis was authorized to purchase the stock, or that the directors ratified the purchase, then if in carrying out that authority it was reasonably necessary to employ the plaintiff, or some one, to aid him, we think the power to do so was implied in the authority to purchase. If so found, the plaintiff was at least entitled to recover a reasonable compensation for his services, not to exceed what he claims was the amount agreed upon. The appellant says in its brief that this prayer was approved by this Court in *Bastian's Case, supra,* but that is a mistake. In that case the lower Court granted the third prayer of the defendant, which seems to be the one relied on, and the appeal was taken by the defendant from the rejection of its first and fourth prayers, and this Court was not called upon, and did not pass upon the third prayer. Hence it is immaterial whether it was a correct prayer in that case, as it was not under the circumstances of this one and is not binding on us. As the defendant declined to have its twelfth prayer modified by inserting the words "express or implied," after the word "authority" in the fourth line, the Court refused it. The Court might have inserted those words and have given the defendant the opportunity to except to the modification, but as it was right under the circumstances of this case in insisting upon the modification, which the defendant refused to agree to, it cannot be said to have been reversible error. The appellant referred to the seventh prayer of the appellant granted in *Oxweld Acet. Co.* v. *Hughes,* 126 Md. 437, but that prayer was not passed on by this Court, and, moreover, there was not the same reason for the modification of that prayer as there was for modifying this twelfth prayer. By the defendant's thirteenth prayer, which was granted, the burden was put upon the plaintiff to establish the contract, and that together with the other granted prayers presented the defense as fairly as the defendant was entitled to ask.

4. What we said above is sufficient, without discussing at length the point that there was no ratification of the alleged

contract because the board of directors had no knowledge of it. The evidence being legally sufficient to show that Maginnis was authorized to make the purchase, if it was reasonably necessary and proper as a part of the transaction to employ the plaintiff to assist him, the ratification of the purchase carried with it the duty to pay such compensation. If a corporation authorizes its agent to make a purchase, who for some reason misleads the board as to commissions he agreed to pay one he employed, or withholds information as to them, is the party who rendered the services to suffer, or the company? There ought not to be any question about the correct answer to that, in so far as the one employed is concerned.

5.    Then it is said that the alleged contract was void because prohibited by the statute (Art. 23, Sec. 186-A, Vol. 4 of Code). Just how that could be made applicable to the purchase of stock of another company has not been made clear. The appellant's contention would prevent such a company as it from purchasing property for its offices, and from paying commissions to its agents engaged in selling policies of insurance. The company had been organized, and was ready for business, but had not gotten it until the Eureka stock was purchased. But if it be conceded that the statute did apply, it was contemplated to change the charter of this company, if another company was acquired. That was a part of the plan, and as early as August 21st the resolution to do so was passed by the directors and approved on September 24th by the stockholders—indeed as early as June 19th, the board had before it details of a plan for purchasing control. While the plaintiff's services began early in June they were not terminated until in October, and the sale was not consummated until December. It would be unjust to hold that a corporation could escape its just debts on any such ground.

6.    The appellant also argued that to affirm this judgment would increase the liability of those who became surety for and guaranteed the payment of the deferred payments, and interest thereon, mentioned and described in the agreement.

How that can be has not been explained, and could not be, so far as it appears on the face of the guaranty. Those sureties and guarantors could not be held responsible for one dollar of the commissions, under the paper signed by them.

7.   It only remains to refer to the exceptions to testimony. There was no reversible error in the first. It was proper to show that Mr. Maginnis occupied the offices of the company, and in what capacity he was there. As the question of agency was involved, perhaps the witness should not have been permitted to say that Mr. Maginnis *told him* he was in charge, but that is shown by other parts of the record, and it could not be held to be reversible error. The second, third, fourth, fifth, sixth and seventh were in relation to Mr. Mahool having negotiations for the purchase of the Sun Life Insurance Company. The testimony showed how the company was conducting that sort of business, and that is permissible in undertaking to prove the powers of an agent, if the evidence reflects on the matter on trial. Mr. Mahool was only a vice-president until some time in October, and yet he was dealing with the Sun Company, and that too through another or others, as Mr. Maginnis was for the Eureka. The question of commissions arose, and Mr. Mahool asked Mr. Stimpson to see Mr. Maginnis whether the company would allow commissions to the party acting for him in that deal. That tended to show what the company was doing in that respect, and reflected upon how the other officers and directors regarded Mr. Maginnis, as well as to show what the custom of the company was. There was no error in either of those exceptions.

The eighth, ninth, tenth, eleventh, twelfth and thirteenth were in reference to Mr. Musgrave's testimony, and the fourteenth, fifteenth and sixteenth to Mr. Hall's testimony. It was, of course, admissible to prove by these gentlemen that the plaintiff had been to them in reference to the acquisition of this stock, etc. He had the right to prove the fact that he went to see them about it, and to show that he had started

and continued the negotiations which resulted in the pur-
chase, but we cannot understand upon what theory it was per-
missible to prove by Mr. Musgrave what is shown by the
eleventh, twelfth and thirteenth exceptions.   He was asked
in the eleventh: "You will remember that Mr. Stimpson nar-
rated how he and Musgrave discussed the amount of the com-
mission and then he went back to Maginnis and told him
they had agreed on 2½%, and Maginnis said that was all
right." Although that question was objected to, he was per-
mitted to answer, and said, "Yes." Then in the twelfth he
was asked, "What was the amount of commissions to be re-
ceived?" and replied, "Two and one-half per cent. is what
we considered fair." Then this appears: "The Court: Well,
when you say what you consider fair, I suppose you mean
considered and agreed?   A. Well, the understanding was
just about as Mr. Stimpson related it, your Honor.   He had
it substantially correct in his testimony." Whereupon the de-
fendant moved to strike out the above answer as follows: "Mr.
New: Now, that last answer I would like to move to strike
out; I understand that is conversation which Mr. Stimpson
reported back to Mr. Musgrave as having been said to Mr.
Maginnis.   The Court: No; I understand Mr. Musgrave
says Mr. Stimpson's report to Mr. Maginnis of the conversa-
tion between Musgrave and himself was substantially correct.
The witness: Yes, sir."

As we have already seen, there was a sharp conflict be-
tween Mr. Maginnis and the plaintiff.   The former denied
that the subject of commissions had ever been mentioned,
until after the sale was agreed upon, or that he had author-
ized the plaintiff to see Mr. Musgrave about it, or that the
plaintiff reported to him what he said about it.   Mr. Mus-
grave knew nothing whatever about what the plaintiff re-
ported to Mr. Maginnis, excepting from what the plaintiff
told him.   What Mr. Maginnis promised to pay, if anything,
cannot be shown by what the plaintiff and Mr. Musgrave
agreed upon, and by what Mr. Musgrave said Mr. Stimpson

told him Mr. Maginnis said.  It was hearsay, pure and sim-
ple, and inadmissible.  It was important, for, although Mr.
Maginnis had not yet gone on the stand, by that time the
character of the defense must have been known.  The plain-
tiff knew that Mr. Maginnis had denied making any agree-
ment about making commissions.  As Mr. Maginnis had not
testified, it may be that Sec. 3 of Art. 35, in reference to
corroborating testimony when a witness is impeached, does
not apply (*King* v. *Zell,* 105 Md. 438), but it was not ad-
missible evidence, regardless of that statute.  As the trial
judge thought it was admissible, it may have had an impor-
tant effect on him in deciding the facts, as when there is such
conflict as there was in this case between the two principal
witnesses, any corroborating evidence of a material nature is
necessarily effective.  We think, therefore, there was revers-
ible error in the rulings in the eleventh, twelfth and thir-
teenth exceptions.  We find no error in the fourteenth, fif-
teenth or sixteenth, nor was there any in the seventeenth.
What we have said above sufficiently disposes of the nine-
teenth, which contains special exceptions to the plaintiff's
prayer.

It follows that we must reverse the judgment for the errors
in the eleventh, twelfth and thirteenth exceptions, but as
these are the only errors we found, we will direct that each
side pay for its own brief, and that the costs in this Court,
including the transcript and printing of record, be equally
divided, and that those in the lower Court abide the result of
the case.

> *Judgment reversed and new trial awarded, each
> side to pay for its own brief and one-half of
> the other costs in this Court, including the
> transcript and printing of record, and the costs
> below to abide the final result.*