## CLINE *v.* FOUNTAIN ROCK LIME AND BRICK COMPANY, INC.

[No. 112, October Term, 1955.]

80

*Decided May 7, 1956.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON and HAMMOND, JJ.

*Charles McC. Mathias, Jr.,* and *Stanford Hoff,* with whom was *Charles McC. Mathias* on the brief, for the appellant.

*Edward D. Storm* and *Charles O. Fisher* for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal from a judgment for $7,000 entered upon the verdict of a jury in the Circuit Court for Carroll County in favor of the plaintiff-appellee, Fountain Rock Lime and Brick Co., Inc. (Fountain Rock), against the defendant-appellant, Earl H. Cline. The suit was originally filed in Frederick County, and various preliminary matters were acted upon there. It was removed on suggestion of the defendant and was sent to Carroll County for trial.

The suit was brought on the common counts and on a special count which alleged that the "defendant agreed with the plaintiff to lease the plaintiff's real estate, plant and equipment and to pay the plaintiff for the same a percentage of profit with a guaranteed minimum amount; that the defendant took possession under the terms of the said oral agreement, of the plaintiff's property and used it for his own benefit but has never made any payment under his agreement, although the plaintiff has done everything under the contract that it was supposed to do." In response to an order to furnish the particulars of its claim, the plaintiff filed a bill of particulars which

asserted claims against the defendant "by terms of an oral contract": for (1) top soil and clay taken from its property and sold by the defendant without the plaintiff's permission; (2) a right of way "sold or given to the Frederick County Roads Board without the plaintiff's knowledge and consent"; (3) rents received by the defendant from the rental of dwellings and not accounted for; (4), (5), (6) and (7) amounts paid by the plaintiff for taxes, interest on mortgages, mortgage principal and insurance for the years 1950 and 1951 "guaranteed by the defendant"; (8) payroll paid by the plaintiff on the defendant's account for those years; (9) $50 a week "guaranteed by the defendant to the plaintiff" for those years; (10) damages for breach of contract to pay items (4)-(7) and item (9), "which contract was to run until 1955"; and (11) "special damages for destroying the plaintiff's good will and causing plaintiff's business to be destroyed by the defendant's holding himself out as owner of the plaintiff's property and receiving contracts and profits on the strength of his representations."

The case was submitted to the jury under instructions, to which the appellant duly excepted, which permitted the jury to award damages for "rent lost" (which seems to go beyond item (3) of the particulars), taxes, interest and insurance (items (4), (5) and (7) of the bill of particulars) and for the cost of pumping out the plaintiff's quarry and for the loss of the plaintiff's share of the profits on a contract (or subcontract) with a concern known as Conduit and Foundation Company (referred to below as the "Conduit Company") for rock used as rip-rap for or adjacent to the abutments of a bridge. The item for pumping out the quarry is not readily identifiable with any of the items enumerated in the bill of particulars. The appellee seeks to support the claim for lost profits on the Conduit Company contract as falling within item (11) of the bill of particulars.

The plaintiff's damage prayer, which was granted, made no specific reference to items (1), (2), (6), (8) or (10) of the bill of particulars. Testimony as to any damages under items (1) and (2) was inconsequential. Item (10) seems to be essentially a duplication of other items. Testimony was

offered in support of items (6) and (8) showing claims of $4,000 on the former and of slightly over $1,500 on the latter.

## The Facts.

Some of the facts of the case are fairly clear; others are shrouded in obscurity, which seems to be due in the case of the alleged original understanding between the parties quite as much to vagueness as to conflicts in the testimony.

Cline is a general contractor living in Frederick, who is engaged there and elsewhere in the construction business and in heavy hauling and moving. Starting with little education or resources he has built up a substantial and successful business.

Fountain Rock is a corporation which owns a twenty-one acre tract in Frederick County upon which is located a limestone quarry. It is improved by several cottages, stone bins and a lime shed. In 1949 there were on the property a hammermill used for lime and a decrepit stone-crusher. There were also two watercress ponds rented to a third party not directly involved in this controversy, and the property has an abundant supply of water.

In 1946, Mr. John W. Quynn became the principal stockholder of Fountain Rock. He owns 2001 of its 2002 outstanding shares and his son owns the other share. In 1949 Quynn was Secretary, Treasurer and General Manager of Fountain Rock and ran the business. Up to that time he had used the quarry for the production of lime. He had not engaged in the stone business except to the limited extent of selling surplus stone which was a by-product of the lime business. Fountain Rock was not in a position to enter into the stone business on a competitive basis because it lacked an adequate stone-crusher. It likewise lacked the large platform scales which are necessary for weighing stone.

In 1949 Fountain Rock had 300 tons of lime on hand, which was enough to supply its trade for about a year and a half, or possibly longer. A good deal of road construction work was developing in the area, and Quynn wanted to get the benefit of it, but he was in poor health and his Company apparently lacked capital with which to buy the needed equip-

ment. Quynn would have liked to sell the Fountain Rock quarry at a price satisfactory to himself, or failing that, to find someone who could and would use the Fountain Rock quarry and supply the adequate stone-crushing equipment.

Cline was interested in getting stone for the same type of business that Quynn wanted to get into. He and Quynn had known each other for some time and had submitted a joint bid on a project in 1948, and Cline had bought from Fountain Rock surplus stone left over from its lime-kiln operations.

Quynn learned in 1948 or 1949 that Cline was negotiating for a small quarry owned by someone else and attempted to sell Cline the Fountain Rock quarry. This effort was not successful, but the negotiations led to some sort of agreement with regard to Cline's using stone from the Fountain Rock quarry.

Quynn asserts that Cline told him in 1949 that if he (Quynn) would hold on to the quarry, which was losing money, until the end of the year, then early in 1950 when Cline would not be so busy, he would put in a stone crusher at Fountain Rock and they would go in business together, which Quynn understood to be on a "fifty-fifty" basis. This is now described as a joint adventure agreement between Cline and Fountain Rock. A partnership was evidently the kind of thing which Quynn had in mind, but he believed that because Fountain Rock was a corporation it could not be a partner.

At this point obscurity descends over the facts. The precise terms of the joint adventure agreement are not shown. Quynn claims that Cline and Fountain Rock were to divide the profits evenly, but no basis is shown upon which the profits were to be computed. The one contract upon which Fountain Rock bases a claim was the contract between Cline and Conduit for rip-rap. What elements of cost were to be considered before arriving at the amount of the profit is not shown. Not only is nothing said as to determining Cline's hauling costs and any overhead expenses attributable to this job, but it is not clear upon what basis the stone from the Fountain Rock quarry was to be furnished. Actual practice seems to have been that Cline paid for all stone which he took from Fountain Rock for other jobs. In the events which occurred no stone

whatever from Fountain Rock was actually used on the Conduit contract.

In connection with another contract for stone in the performance of which Cline did use Fountain Rock stone, Quynn protested against the low price at which the stone was billed to Cline's customer, but did not make any claim for profits on the rental of equipment owned by Cline, though (according to Quynn) Cline justified the low price of stone by the handsome return he was getting through the rental of equipment on that job.

Whatever the understanding between Fountain Rock and Cline may have been, Cline did purchase and install scales for weighing rock on the Fountain Rock property early in 1950. He patched up the decrepit stone crusher, but never installed a new one. Cline seems to have taken over general control of the Fountain Rock quarry. He put some of his own employees in one or two of the Fountain Rock dwellings, and one of the residences was moved, with Quynn's knowledge and consent, to a concrete foundation put in by Cline and was used as an office in connection with the newly installed scales.

Insofar as quarrying was concerned, some of the old Fountain Rock employees continued to work at it and remained subject to Quynn's orders; but at times, at least, in order to speed up operations, Cline's men engaged in quarrying work. Some few of Fountain Rock's employees became employees of Cline after having been laid off by Fountain Rock.

At some time apparently in the spring of 1950, difficulties which Cline was having with regard to his federal income taxes became acute. News of these difficulties reached Quynn, who became much concerned or even alarmed over them and over any possible repercussions affecting Fountain Rock. As a result, he reached the conclusion that a lease of the Fountain Rock property to Cline was desirable. He claimed that this was necessary to save Cline or to pull him out of a hole. Just how it could have done so is not shown. Such a lease was prepared by Fountain Rock's counsel, and according to Quynn it was revised to meet an objection raised by Cline on the

ground that it did not protect Cline's right to remove any equipment which he might install.

The proposed lease was dated "this ...... day of May, 1950," and was to run for a term of five·years. Its most significant terms, so far as this case is concerned, were (1) that Cline should operate Fountain Rock's real estate, plant and equipment as a stone-crushing business; (2) that Cline should pay Fountain Rock 5% of the selling price of stone at the plant; (3) that Cline would "guarantee" that cash payments to Fountain Rock would be sufficient to cover taxes, interest on mortgages and notes, mortgage principal, insurance and $50 a week besides. Perhaps still more significant is the fact that the proposed lease did not even mention any profit-sharing arrangement of any kind.

Quynn testified that he submitted the proposed lease to Cline, that Cline agreed to all of its provisions and said he would sign it, but that he kept putting it off and never did sign it. Cline agrees that he never signed any agreement; in other respects his testimony differs from Quynn's.

Although the Conduit Company rip-rap work was in prospect as early as 1949, the contract was not awarded until August 15, 1950. Quynn claims to have been very helpful to Cline in connection with this contract, but the extent of his help seems very dubious. Quynn was sitting in Cline's office one day when the Conduit Company's superintendent stopped in to talk about it. Cline was out and Quynn talked with him. Quynn later obtained specifications for the work from the State Roads Commission. In June, 1950, a month or more after the proposed lease had been drafted, Quynn figured out a basis for bidding on the Conduit job. Cline seems to have made little, if any, use of Quynn's estimate, submitted a higher bid than Quynn recommended and got the contract. Under the specifications the rip-rap was measured in place and was paid for on that basis. It was not necessary to weigh the stone, so the scales which Cline had installed would not actually have been required if the stone had come from Fountain Rock.

For causes for which neither Quynn nor Cline was responsible actual work on the Conduit Company contract did

not begin until about May, 1951. Quynn, by that time, had wearied of Cline's delay in the signing of the proposed lease, and when Cline again postponed it, saying that he would sign it that night, Quynn took the paper back. This was within a few days of the date when installation of the rip-rap was to begin. Cline then arranged to get the requisite stone from another quarry and did so. Cline says that this was because Quynn would not allow him to take stone from Fountain Rock unless he first signed the agreement. Quynn contended, on the basis of the testimony of a former employee of Cline, that Cline's purpose was to avoid having to carry out his agreement with Quynn and to get Quynn into such a bad financial position that Cline could buy the Fountain Rock quarry on his own terms.

### Questions.

The principal questions presented on this appeal are these: first, was the proposed lease which was never executed by Cline properly admitted in evidence?; second, could damages be awarded to Fountain Rock on the basis of the provisions of that lease?; and third, was the jury permitted to award damages to Fountain Rock on claims not covered by its bill of particulars?

1. *Admissibility of the Unexecuted Lease.* The appellant contends that whatever agreement may have existed between him and Fountain Rock, it involved a lease or some other kind of interest in or concerning land, and did not measure up to the requirements of the Statute of Frauds. The appellant further contends that even though the agreement may have contained some elements or factors which were only indirectly related to the real estate itself, this would not remove the case from the operation of the Statute of Frauds. The latter contention is supported by *Hamilton v. Thirston,* 93 Md. 213, 218, 48 A. 709, where with reference to an alleged contract to devise and bequeath a share of both real and personal estate in return for services, the Court said, "As to the real estate to be devised the contract before us is obviously within the fourth section of the statute, and, as it is an entire contract upon one and the same consideration, it

must under the settled rules of construction be held void under the statute as to both classes of property." The Court cited, among other authorities, *Alexander v. Ghiselin,* 5 Gill 138, 180, which also recognizes that rule. It was held in *Hamilton v. Thirston* that because the contract was within the fourth section of the Statute of Frauds, it could not be made the foundation of an action at law and would not sustain a suit for damages for its breach.

The alleged contract in that case was "in essence a contract for the sale of real and personal estate." The unexecuted agreement in the instant case is primarily a lease, plus a contract for the sale of stone when severed from the realty. No claim is made for the price of any stone sold, and it appears that Cline paid for all of the stone which he obtained from this quarry. We are, therefore, not immediately concerned with the application of the Statute of Frauds to that part of the alleged agreement.

The plaintiff does not and cannot rely on the doctrine of part performance in order to take the case out of the operation of the statute. His suit is at law and that doctrine, if applicable at all, is available only in equity. *Hamilton v. Thirston, supra.*

Although a lease which does not meet the requirements of the Statute of Frauds cannot be made the basis of an action, yet if the tenant takes possession under it and occupies the premises, the law implies a verbal agreement of similar import to that expressed in writing and the tenant may be held liable on such an agreement. *Kinsey v. Minnick,* 43 Md. 112; *Anderson v. Critcher,* 11 Gill & J. 450. *Kinsey v. Minnick* is cited with approval and followed in *Falck v. Barlow,* 110 Md. 159, 163, 72 A. 678, 679, where the invalidity of the lease was due to a failure to comply with the provisions of the recording act. As is said in 49 Am. Jur., *Statute of Frauds,* Section 190, page 519: "Entry by the tenant under an oral lease for a longer period than authorized by the statute creates the relation of landlord and tenant between the parties."

*Thompson on Real Property,* Permanent Ed., Vol. 3,

§ 1033, contains a similar statement of the law: "Where a tenant enters and occupies under an invalid parol lease, the agreement governs the terms of the holding as to amount and time of payment of rent and other matters, but not as to the duration of the term. A lease void under the statute of frauds because not in writing will nevertheless regulate the terms of the tenancy as respects the rent, the amount thereof and the time of payment." See also § 1229 of the same work, where the author says: "The relation of landlord and tenant is created where one enters, occupies, and pays rent under a lease invalid by reason of a non-compliance with the statute of frauds, the relation arising from the occupation of the premises and the payment and receipt of the rent therefor, and not by the lease." See also *Tiffany, Real Property*, 3rd Ed., Section 82.

There is no question about Cline's occupancy of the premises; but according to Quynn's testimony he entered under one agreement and continued to hold under another. Cline's testimony contradicted Quynn's as to both of the alleged agreements. The court did not require the jury to determine what was the agreement between the parties, but instructed the jury that it might award damages to the plaintiff on several items substantially in accordance with the provisions of the unexecuted lease. Although we think that this lease was properly admissible in evidence on the basis of Quynn's testimony that Cline had agreed to its terms, we also think that the jury should have been instructed to find whether or not Cline did agree to its terms. Of course, in accord with the authorities above referred to, the provision for its continuing for five years was ineffective and not binding upon Cline. The fact that the agreement was oral would not bar the use of the unexecuted document to show what were the terms upon which it was claimed that the parties had actually agreed. We are not passing upon the weight of the evidence, but only its admissibility.

*2. Damages Based upon Provisions of Lease.* In the light of the authorities referred to under the first question, we think that damages could be awarded in accordance with

the terms of the unexecuted lease, if it was established as the agreement of the parties.

The appellee also contends that damages for items included in its bill of particulars could be awarded under the money common counts of the declaration on a *quantum meruit* basis.

There would be little profit in reviewing the many authorities which hold that the common counts may be joined with a special count and that recovery cannot be had on the common counts if a special contract is proven. However, there can be a recovery on the common counts where there is a bill of particulars which shows that there was a special contract. Recovery may also be had under a common count where there is a special contract and the plaintiff has fully performed his part so that nothing remains to be done except to collect what is due. *Conservation Co. v. Stimpson,* 136 Md. 314, 110 A. 495. See also *Hamilton v. Thirston, supra; Ellicott v. Peterson's Executors,* 4 Md. 476; *Baker v. Lauterbach,* 68 Md. 64, 11 A. 703.

There was no evidence offered as to the reasonable rental value of the Fountain Rock property, and the whole effort of the appellee was to recover on an oral contract—or on two such contracts. The bill of particulars, however, referred to only one. It would seem that insofar as the common counts are concerned, the plaintiff's right to recovery is based as to a number of items included in the damage prayer upon the theory that the plaintiff had fully performed all of its obligations under the oral contract, so that nothing remained to be done except to collect the sum of money which was due. The result as to most of those items would be the same on this theory as under the unexecuted lease. The claims asserted in Item (11) of the bill of particulars for "Special damages for destroying the plaintiff's good will and causing plaintiff's business to be destroyed by the defendant's holding himself out as owner of the plaintiff's property and receiving contracts and profits on the strength of his representations" seem wholly inappropriate under the common counts.

3. *Damages and the Bill of Particulars.* The appellant

contends that the instructions with regard to damages are to a considerable extent inconsistent with the particulars of the appellee's claim as set out in its bill of particulars. We think that this contention is well taken as to the claim for "rent lost", as to the claim for pumping and as to the claim for a share of the profits on the Conduit Company contract.

The bill of particulars operates to limit the plaintiff's claim to the items specified therein. *Poe on Pleading and Practice,* 3rd Ed., Vol. 2, Section 116; *Rosenthal v. Heft,* 155 Md. 410, 142 A. 598; *Lyell v. Walbach,* 111 Md. 610, 75 A. 339; *Roth v. Baltimore Trust Co.,* 161 Md. 340, 158 A. 32; *2 Maryland Law Review,* 318.

The claim for rent stated in the bill of particulars is for rents received by Cline from leasing dwellings belonging to Fountain Rock and not accounted for. The damage prayer allowed recovery for rent lost by Fountain Rock, without regard to whether or not Cline had collected it and failed to account therefor. This went beyond item (3) of the bill of particulars.

The claim for the cost of pumping out the quarry is not mentioned at all in the bill of particulars and accordingly recovery for it should not have been allowed.

The largest item for which recovery was permitted under the granted damage prayer was for a share of the profits on the Conduit Company contract. There are several difficulties with regard to this claim. The first is whether or not the terms of the alleged joint adventure were proven with sufficient definiteness to constitute a contract, the second is whether or not its enforcement would be permissible under the Statute of Frauds, the third is whether it was so indefinite as to afford no sufficient basis for the computation of the profit which Fountain Rock claims was to be divided equally, the fourth is whether or not such an agreement, if made and if valid and enforceable, was superseded by the oral lease, and the fifth is whether or not such a claim is included under the bill of particulars. We think that only the last question calls for decision, and we are of the opinion that such a claim was not covered by the bill of particulars.

The claim for a share of the profits on the Conduit Company contract is based upon an alleged oral joint adventure agreement providing for an equal division of profits. The only item of the bill of particulars to which the appellee seeks to relate this claim is item (11) for special damages for destroying the good will of the appellee's business and "causing plaintiff's business to be destroyed by the defendant's holding himself out as the owner of the plaintiff's property and receiving contracts and profits on the strength of his representations."

No part of item (11) is applicable to this claim. The defendant's profit on the Conduit Company contract bears no relation whatever to any value which the good will of the plaintiff's business may have had.

As to the second branch of item (11), we cannot see that it furnishes any foundation for this claim. There is nothing in the testimony to show that Cline obtained the Conduit Company contract on the strength of any representation that he was the owner of Fountain Rock's property. The Conduit Company's foreman came to Cline's office on the first visit which led up to the awarding of the contract to Cline. The exact location of that office does not appear, but it does appear clearly that it was not at the Fountain Rock quarry. Quynn happened to be in Cline's office at that time. That fact certainly constituted no representation by Cline that he owned the Fountain Rock quarry and there is absolutely no showing whatever that the award of the Conduit Company contract was based upon his supposed ownership of that quarry. (It may be noted in this connection that the proof shows that the contract was actually filled by the use of stone from another quarry.) There is simply nothing whatever to indicate that Cline's representation of ownership of Fountain Rock had anything to do with the matter.

Since there was nothing to bring the claim for a share of the profits on the Conduit Company job within the scope of the bill of particulars, evidence of the amount of the profit was irrelevant and should not have been admitted. The effect of its admission is not clear. Since one-half of the

asserted profit on this contract would have been more than twice the amount of the verdict, it is quite apparent that the jury did not take it at face value. On the other hand, the amount of the jury's verdict cannot be matched with the amounts of any elements or combination of elements of damages claimed by the plaintiff, and we cannot assume that the admission of this evidence was harmless error.

In accordance with the views above expressed, the judgment must be reversed and a new trial awarded.

> *Judgment reversed and case remanded for a new trial, with costs to the appellant.*