# PUBLIC SERVICE COMMISSION ET AL. v. HIGHFIELD WATER COMPANY ET AL.

[Misc. No. 8, September Term, 1980.]

*Decided February 26, 1982.*

2

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON, and RODOWSKY, JJ.

*Susan K. Gauvey, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Marc K. Cohen, Assistant Attorney General,* on the brief for appellant Department of Health and Mental Hygiene and *Roger D. Redden* and *David M. Funk* on the brief for appellant Public Service Commission.

*Richard N. Foltz, III,* with whom was *Daniel M. Twomey* on the brief, for appellees.

DAVIDSON, J., delivered the opinion of the Court.

The United States District Court for the District of Maryland (District Court), pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 1980 Repl. Vol.) §§ 12-601 to 12-609 of the

Courts and Judicial Proceedings Article, requests that this Court answer the following question of law:

"If a local governmental entity in Maryland takes possession of privately-owned property devoted to the public service, does there arise an implied contractual obligation to pay the fair market value of that property which is separate and distinct from any right to fair compensation that may also arise under the Maryland or United States Constitution?"

For purposes of this proceeding, all of the parties have adopted the statement of facts contained in the District Court's opinion in *Highfield Water Co. v. Public Service Commission,* 488 F.Supp. 1176, 1180-85 (D.Md. 1980). The underlying facts as set forth there are as follows.

On 28 September 1979, in the District Court, the plaintiffs, Highfield Water Company (HWC) and William Seltzer, its president and sole shareholder, filed suit against the defendants, various State and local agencies including, insofar as here relevant, the Public Service Commission (PSC), the Department of Health and Mental Hygiene (Health), the Washington County Sanitary District (WCSD), and against various persons connected with these agencies in both their official and individual capacities. The complaint alleged, among other things, that HWC, a Maryland Corporation, was incorporated in 1905 for the purpose of supplying water to Highfield, Maryland, a sparsely populated area in the western part of the State. In 1966, Seltzer purchased the company. According to the complaint, HWC faced numerous problems at that time. First, because Seltzer's predecessor had not charged the company for his personal services, office space, and supplies, the rates for water were unreasonably low. Second, portions of the system needed replacing. Third, the demand for water was almost equal to the supply so that any increase in demand would necessitate expansion of the existing facilities.

As a result, HWC filed for a rate increase in 1968. The PSC granted only what HWC terms a "token" increase. Ini-

tially, it was sufficient to meet operating expenses, but allowed no improvements. Thereafter, it was not sufficient to meet operating expenses and HWC was operated at a loss.

In 1978, despite consistent efforts to correct the deficiencies in the system, HWC was experiencing substantial difficulty in supplying enough water to meet the then current demand and was still operating at a financial loss. On 8 September 1978, PSC revoked HWC's franchise "consistent with the public convenience and necessity to have public ownership." The revocation was effective 1 October 1978.

On 15 September 1978, Health ordered WCSD to operate HWC's system and to proceed to acquire ownership. On 29 September, WCSD filed suit in the Circuit Court for Washington County (Circuit Court) against HWC. The Bill of Complaint alleged that the PSC terminated HWC's franchise due to years of inadequate and unsatisfactory service and deteriorated facilities, and that HWC constituted a serious menace to the health, safety, and comfort of the public. On that same day, WCSD obtained an ex parte injunctive order preventing HWC from interfering with operation of the system by WCSD.

On 5 October 1978, WCSD sought an extension of the injunction. The HWC alleged that before the seizure, Health and WCSD had indicated an intent to acquire HWC by purchase or condemnation under the mistaken assumption that 80% federal funding would be available for the purchase. Allegedly, these agencies subsequently discovered that this was incorrect and that funding was available only for new construction or improvements. Health and WCSD allegedly determined that with federal funding they could build a new plant within two years, with billing rates equal to or less than those of HWC. They allegedly planned to abandon the HWC system upon completion of the new plant. On 21 November 1978, WCSD asked for another extension on the ground that it needed time to decide whether it was going to build a system of its own. Although the Circuit Court extended the injunction until 31 January 1979, it expressed

concern about a seizure without compensation, and advised WCSD that it would have to compensate HWC even if WCSD built its own system.

On 5 January 1979, WCSD asked for another extension to 30 April 1979 which was denied. On 13 January, Health ordered HWC to appoint the Maryland Environmental Service (MES) or WCSD to operate the system until WCSD replaced the "present inadequate system with a new safe and adequate public water system." The HWC asserted that WCSD had equitable title in the system since 1 October 1978, and thus HWC could not comply with the Health order. About ten days after its order, Health filed suit against HWC for failure to comply. The Circuit Court issued an injunction allowing WCSD to continue running the system under the same conditions imposed by the previous injunction. The WCSD is now said to be operating the system under court order, not as the agent of HWC.

The complaint filed in the District Court contained 12 counts. Count I, Breach of Implied Contract, stated, in pertinent part:

"58. On October 1, 1978, Defendant — WASHINGTON COUNTY SANITARY DISTRICT, under color of state law, seized possession of Plaintiffs' property and ejected Plaintiffs from the premises by obtaining an Ex Parte Injunction Order and subsequent series of Interlocutory Injunctive Orders enjoining Plaintiffs from interfering with Defendant — WASHINGTON COUNTY SANITARY DISTRICT'S takeover of the subject water system and further adding Plaintiffs to assist in the take-over of the property.

"59. Defendant — WASHINGTON COUNTY SANITARY DISTRICT, in their Bill of Complaint ejecting Plaintiffs from their property, seizing possession thereof, and enjoining Plaintiffs from interfering with Defendant's operation of the subject water system, stated that they were acting pursuant to Defendant — HEALTH DEPARTMENT'S

September 15, 1978 Order that directed Defendant — WCSD to acquire <u>ownership</u> of the property.

"60. The United States, the State of Maryland, a Maryland municipal corporation, or a local government may only <u>lawfully</u> acquire ownership of private property by gift, purchase, or condemnation.

"61. Plaintiffs have not transferred ownership of their property to Defendants by gift.

"62. Defendants have not acquired ownership of Plaintiffs' property by condemnation.

"63. If Defendant — STATE OF MARYLAND or any of the Defendants herein, acting as agents for Defendant — STATE OF MARYLAND or on behalf of themselves, were acting lawfully, then they must have intended to purchase Plaintiffs' Highfield water system for its fair market value when they seized possession of it.

"64. Therefore, at the moment of seizure, an implied purchase contract was created, and under the doctrine of equitable conversion, equitable title to Plaintiffs' property passed to Defendants, and Defendants became obligated to compensate Plaintiffs for the fair market value of the water system.

"65. At the time of the seizure, Plaintiffs' water system had a fair market value of One Million Dollars ($1,000,000.00).

"66. Defendants have not compensated Plaintiffs for the taking of the Highfield water system.

"67. Defendant — STATE OF MARYLAND and its agents, named herein as defendants, who were acting in a lawful manner, on behalf of Defendant — STATE OF MARYLAND or on behalf of themselves, breached their implied contract to purchase the Highfield water system.

"WHEREFORE, this suit is brought and Plaintiffs claim compensatory damages in the amount of

One Million Dollars ($1,000,000.00)." (Underlining in original).

Count V, Deprivation of Civil Rights (42 U.S.C. § 1983), alleged that, under color of State law, the defendants deprived plaintiffs of their civil rights secured by the United States Constitution through misuse of administrative powers and judicial proceedings that resulted in an unlawful seizure of the plaintiffs' property without just compensation. This count sought a declaratory judgment as well as compensatory and punitive damages. Count VIII, Violation of the Fifth and Fourteenth Amendments of the United States Constitution and Maryland Declaration of Rights, Article 24 (formerly 23), alleged that the misuse of administrative powers and judicial proceedings which resulted in an unlawful seizure of plaintiffs' property was tortious and in violation of the Fifth and Fourteenth Amendments and of the Maryland Declaration of Rights. This count also sought a declaratory judgment as well as compensatory and punitive damages.

The defendants filed motions to dismiss.[1] The claims set forth in Count I and Count V were not dismissed. That portion of Count VIII seeking damages directly under the United States Constitution was dismissed. That portion of Count VIII seeking damages and a declaratory judgment under the Maryland Declaration of Rights, and a declaratory judgment under the United States Constitution was not dismissed.

In the motions to dismiss, the defendants asked the District Court to abstain from deciding the issues presented in the complaint. With respect to this request, the District Court said:

---

1. In orders dated 9 April 1980, as amended 20 May 1980, and 5 March 1981, the District Court, insofar as here relevant, dismissed PSC and the individual defendants connected with that agency as defendants. In addition, Health was dismissed as a defendant. However, the individual defendants connected with that State agency remained as defendants in their individual capacities, but not in their official capacities. The WCSD and the individual defendants connected with that local agency remained as defendants in their individual and official capacities.

"Abstention can be based on a number of different theories. . . . Abstention under [*Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643 (1941)] is appropriate to avoid deciding a federal constitutional issue where the case may be disposed of by a decision on questions of state law.

. . .

"The typical case in which *Pullman* abstention is appropriate involves an unclear state statute, interpretation of which could eliminate the need for the federal court to reach the constitutional issue.

. . .

"The only unclear state law potentially dispositive of this case which the defendants have brought to the Court's attention is the implied contract claim. The PSC argues that this claim could resolve the dispute, and that the legal issues are unclear, since the Maryland Court of Appeals apparently has not addressed an implied contract question since 1863. *Baltimore & Ohio R.R. Co. v. Clark,* 19 Md. 509 (1863). It is not clear, however, that one must look to state law to resolve the implied contract claim. It has been held that a contract is implied when federal government actions result in a taking. '. . . if the authorized action in this instance does constitute a taking of their property for which there must be just compensation under the Fifth Amendment, the Government has impliedly promised to pay that compensation and has afforded a remedy for its recovery by a suit in the Court of Claims.' *Yearsley v. Ross Construction Co.,* 309 U.S. 18, 21, 60 S.Ct. 413, 415, 84 L.Ed. 554 (1940). A similar contract might be implied against a local government under federal law.

"Even if no federal implied contract action existed, *the basis of any state action would still be*

*a determination of whether a taking requiring compensation had occurred.* This question could be determined under the U.S. constitution, or the Maryland constitution. The sections of the Maryland constitution which deal with taking of property have been held equivalent to the corresponding federal provisions. 'That these constitutional provisions have the same meaning and effect in reference to an exaction of property, and that the decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities, was settled in *Allied American Co. v. Comm'r.,* 219 Md. 607, 150 A.2d 421 (1959).' *Bureau of Mines v. George's Creek,* 272 Md. 143, 156, 321 A.2d 748, 755 (1974). Thus, resolving the implied contract question will hardly avoid a determination under the federal constitution.

. . .

"Accordingly, the Court concludes that *Pullman* abstention is [in]appropriate in this case." [2] *Highfield Water Co.,* 488 F. Supp. at 1196, 1197 (emphasis added).

On 7 May 1980, the PSC defendants, who were then still parties to the suit, asked the District Court to certify to this Court a question of law relating to Count I, Breach of Implied Contract. They asserted that the resolution of this question might be dispositive of the case and might, therefore, eliminate the necessity of the District Court reaching a constitutional question.

In an order dated 1 August 1980, the District Court stated:

"Cases on such implied contracts suggest to this Court that the contract is based on an underlying unconstitutional taking. *See, e.g., Yearsley v. Ross*

---

**2.** The text of the District Court's opinion states that *Pullman* abstention was "appropriate." In our view, the context in which the term "appropriate" is used indicates that the District Court concluded that abstention was inappropriate. This view is supported by the syllabus preceding the text of the opinion, which states that the District Court held that abstention was "inappropriate."

10

> *Construction Co.,* 309 U.S. 18, 21 (1940); *see also*
> April 9 Opinion at 36-38. The Public Service Com-
> mission defendants argue, however, that an implied
> contract could exist independent of any
> unconstitutional taking. They point out that the
> Maryland Court of Appeals has apparently not
> addressed an implied contract question since 1863,
> *Baltimore & Ohio R.R. Co. v. Clark,* 19 Md. 509
> (1863), and that there is no controlling precedent
> involving similar facts."

The District Court ordered that the following question of law
be certified:

> "If a local governmental entity in Maryland takes
> possession of privately-owned property devoted to
> the public service, does there arise an implied
> contractual obligation to pay the fair market value
> of that property which is separate and distinct from
> any right to fair compensation that may also arise
> under the Maryland or United States Constitu-
> tion?"

The order did not indicate that we could reformulate the
question certified. Under these circumstances, this Court is
not authorized to go beyond the question certified in the
order of the certifying court. *Toll v. Moreno,* 284 Md. 425,
437, 397 A.2d 1009, 1015 (1979); *Krashes v. White,* 275 Md.
549, 557, 341 A.2d 798, 802 (1975); §§ 12-601 to 12-609 of
the Courts and Judicial Proceedings Article. Manifestly,
based on the context of the District Court's opinion, an
implied contractual obligation to pay fair market value
would be separate and distinct from constitutional require-
ments to pay fair compensation only if a resolution of the
implied contract question would avoid a determination
under the Maryland or United States Constitution. Such an
implied contractual obligation would be separate and dis-
tinct from constitutional requirements to pay fair compensa-
tion only if there could be recovery on the implied
contractual obligation without a determination of whether a
taking requiring compensation had occurred. Thus, we are

not being asked to determine whether in Maryland a contractual obligation is implied from the constitutional requirements to pay just compensation. Moreover, we are not being asked to determine whether, under the facts of this case, a "taking" in the constitutional sense had occurred. Rather, in our view, our inquiry is limited to the question certified — whether there exists in Maryland an implied contractual obligation to pay fair market value that is independent of any constitutional requirements or, in other words, whether, under the facts of this case, a contract could be implied without a determination of whether a taking requiring compensation had occurred.

In Maryland, contracts have been implied under varying circumstances in transactions between private parties. *See, e.g., Potterton v. The Ryland Group, Inc.,* 289 Md. 371, 375, 424 A.2d 761, 763-64 (1981), *Oliver v. Gray,* 1 H. & G. 204, 217 (1827) (money had and received — contract implied from acknowledgement of subsisting debt removed bar of statute of limitations); *Merritt Bldg. & Supply Co. v. Shaulis,* 252 Md. 133, 135-36, 249 A.2d 177, 178-79 (1969), *Watchman v. Crook,* 5 G. & J. 239, 263-64 (1833) (work and labor — contract implied where work not completed in conformity with contract but nevertheless accepted); *Plitt v. Greenberg,* 242 Md. 359, 363-64, 219 A.2d 237, 241 (1966) (money had and received — contract implied where money obtained by fraud); *Cline v. Fountain Rock Lime & Brick Co.,* 210 Md. 78, 88, 122 A.2d 449, 454 (1956), *Anderson v. Critcher,* 11 G. & J. 450, 455 (1841) (contract implied where lease void but premises occupied with consent of owner); *Gressitt v. Anderson,* 187 Md. 586, 589-90, 51 A.2d 159, 160 (1947), *DeYoung v. Buchanan,* 10 G. & J. 149, 157 (1838) (use and occupancy — contract implied where tenant holds over after expiration of lease); *Wyeth v. Walzl,* 43 Md. 426, 432-33 (1876) (money paid — contract implied where money paid pursuant to authorization). On occasion, contracts have been implied in transactions involving private parties and local governmental bodies. *See, e.g., State ex rel. Employment Sec. Bd. v. Rucker,* 211 Md. 153, 157-59, 126 A.2d 846, 849-50 (1956) (money had and received — contract implied

where money paid by state agency under mistake of law and fact); *Gaver v. County Comm'rs of Frederick County,* 175 Md. 639, 649-50, 3 A.2d 463, 467-68 (1939) (work and labor — contract implied where municipal corporation requires and accepts services of employee); *Mayor of Baltimore v. Kinlein,* 118 Md. 336, 342-43, 84 A. 483, 485-86 (1912) (work and labor — contract implied where work not performed in conformity with contract but nevertheless accepted by city). None of these cases presents the question whether, independent of constitutional requirements, a contract to purchase and pay for private property should be implied when a local governmental body obtains lawful possession of private property. Accordingly, we write on a clean slate. In our view, it is not possible to imply a contract independent of constitutional requirements under the circumstances here.

The HWC contends that when WCSD took possession of its water system for the purpose of providing public service, WCSD impliedly contracted to purchase the system. It points out that Md. Code (1957, 1980 Repl. Vol.), Art. 43, § 650(b) (8) provides that a county sanitary district can lawfully acquire ownership of private property only by gift, purchase or condemnation.[3] It maintains that since its water system was not acquired by gift or condemnation, WCSD, if it was acting lawfully, must have intended to purchase the water system when it took over its operation. The HWC asserts "that when the property was taken an implied purchase contract arose under which WCSD became obligated to pay the fair market value of the water system." In essence, HWC contends that under the statute, WCSD's failure to condemn requires that its act of taking possession be viewed as evidencing its intent to acquire HWC's property by purchase rather than by condemnation. It concludes that the

---

**3.** Art. 43, § 650 (b) (8) provides in pertinent part:

"Each district is hereby granted and shall have and may exercise . . . the following rights and powers:

. . .

"(8) To acquire by gift, purchase or by the exercise of the right of eminent domain . . . lands or rights in land or water rights in connection therewith. . . ."

statute imposes an obligation on WCSD to purchase HWC's property and, consequently, that a contract to purchase, founded on the statute, must be implied. We do not agree.

Ordinarily, in order to imply a contract, there must be an underlying obligation. 1 A. Corbin, Contracts § 19 at 46-49 (1963). In our view, Art. 43, § 650 (b) (8) does not impose an obligation upon WCSD to purchase HWC's water system.

Section 650 (b) (8) authorizes a sanitary district to acquire property and, therefore, to obtain possession of property by three different methods, at least two of which, purchase and condemnation, are relevant here. This statute does not necessarily establish the exclusive methods by which a sanitary district can obtain possession of property.

A sanitary district, for example, may obtain possession of property through an exercise of regulatory authority under some other provision of law or court order sanctioned by the police power. This Court has consistently recognized that there is a difference between a governmental exercise of regulatory authority and an exercise of the power of eminent domain. While all governmental regulations affecting property restrict the owner's use and enjoyment to some extent, not all such regulations result in a "taking" in the constitutional sense. Regulations or restrictions that deprive the owner of essentially all beneficial use of the property constitute a "taking" in the constitutional sense and require the payment of compensation. However, regulations or restrictions that cause a diminution in value or other hardship, but leave the owner in substantial enjoyment of the property do not constitute a "taking" and do not require the payment of compensation. *Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 579-80, 414 A.2d 1246, 1250-51 (1980); *Maryland-Nat'l Capital Park & Planning Comm'n v. Chadwick,* 286 Md. 1, 8-12, 405 A.2d 241, 244-46 (1979); *Stevens v. City of Salisbury,* 240 Md. 556, 564-66, 214 A.2d 775, 779-81 (1965); *Lipsitz v. Parr,* 164 Md. 222, 234, 164 A. 743, 748 (1933). These principles establish that state law or court order may authorize a sanitary district to obtain possession of property under circumstances in which an obligation to pay is not implied.

This Court has recognized that when there are alternative methods by which a governmental body may proceed, none of the methods is exclusive. In order to determine that a governmental body was acting pursuant to a specified method, the surrounding facts and circumstances must establish that the governmental body was utilizing that particular method.

In *Dunne v. State,* 162 Md. 274, 159 A. 751 (1932), a property owner sued the State of Maryland for damages. The property owner claimed that under the provisions of then Md. Code (1924), Art. 91, § 40, such a suit could be brought directly against the State. It was alleged that the State Roads Commission, exercising its power of eminent domain, had taken possession of and appropriated the property owner's land for public use without instituting condemnation proceedings or paying any compensation. It was further alleged that the State Roads Commission had not followed any of the procedures required by Art. 91, § 40. In determining that the State Roads Commission had not acted pursuant to Art. 91, § 40, and that the property owner's suit could not be brought against the State, the Court stated:

> "The contention of the appellant seems to be that because her property was physically taken by the State Roads Commission, it must have been acting under the State's power of eminent domain, and that she can claim the benefit of the provisions of section 40 of article 91 of the Code, even though it is also alleged that the State Roads Commission has done no single act which that statute provides shall be done before she could appeal to the Circuit Court for Montgomery County.

> . . .

> "If section 40 of article 91 was the only method by which property for highways might be condemned, the argument of the appellant might be entitled to greater consideration. But as pointed out, there are at least two other statutory procedures by which the

State Roads Commission can acquire property for roads and highways. Giving the fullest effect to the appellant's contention that the act of appropriating the property was a step looking to the condemnation thereof by the State, exercising its power of eminent domain, this act, namely, the taking, could apply as well to the other methods of condemnation as to that provided for by section 40 of article 91. What we are asked to say is that it was a taking under the last-mentioned section; that although none of the provisions of that section were followed, nevertheless, because it could have been taken under that section, therefore it was." *Dunne,* 162 Md. at 288, 159 A. at 756-57.

Given the fact that the condemnation method set forth in Art. 91, § 40 was not exclusive, and that no facts or circumstances were adduced to show that the specified method was used, this Court concluded that the State Roads Commission was not acting pursuant to Art. 91, § 40 when it appropriated the owner's property.

Applying a similar rationale to this case produces a clear result. The WCSD may obtain possession of property under § 650 (b) (8) or under regulatory authority. Thus, the methods set forth in § 650 (b) (8) are not exclusive.

Here the record shows that there has been no judicial determination establishing which method was used by WCSD. Indeed, the record shows that there were conflicting facts and allegations concerning which method WCSD was using when it took possession of HWC's facility. The record shows that WCSD obtained possession of HWC's facility pursuant to the Circuit Court's 29 September 1978 order designed to protect the health, safety, and comfort of the public. It also shows that on 15 September 1978, Health had ordered WCSD to operate HWC and to proceed to acquire ownership. The record further shows that HWC alleged that Health and WCSD had indicated an intent to acquire HWC by purchase or condemnation under the mistaken assumption that federal funding would be available for the

purchase. It also shows that HWC alleged that when these agencies determined that the funding was available only for new construction, they planned to build a new facility and abandon the HWC system. In addition, the record shows that WCSD asked for an extension of the injunction on the ground that it needed time to decide whether it was going to build a system of its own. Finally, the record shows that the Circuit Court, in extending the injunction, advised WCSD that it would have to compensate HWC even if WCSD built its own system.

Nevertheless, the question whether WCSD, when it obtained possession of HWC, was exercising power under § 650 (b) (8), or operating under other regulatory authority, which does not imply an obligation to pay, was never litigated or determined. Manifestly, if the District Court were ultimately to determine that when WCSD took possession of HWC it was exercising a regulatory authority, rather than the powers specified in § 650 (b) (8), that statute could not serve as a basis upon which to imply a contractual obligation on the part of WCSD. Thus, in the absence of a judicial determination that WCSD was using one of the powers specified in § 650 (b) (8), a contractual obligation to purchase HWC's property founded on that statute cannot be implied. In short, we cannot conclude that because WCSD could have obtained possession under § 650 (b) (8), that therefore it did.

We find no other basis upon which to imply a contractual obligation arising separate and distinct from constitutional requirements. The United States Supreme Court has repeatedly recognized that when a governmental body takes private property for public use, a contractual obligation to pay compensation may be implied. *See, e.g., United States v. Dickinson,* 331 U.S. 745, 748, 67 S.Ct. 1382, 1384 (1947); *Campbell v. United States,* 266 U.S. 368, 370-71, 45 S.Ct. 115, 116 (1924); *United States v. Lynah,* 188 U.S. 445, 458-68, 23 S.Ct. 349, 352-56 (1903); *United States v. Great Falls Mfg. Co.,* 112 U.S. 645, 656-57, 5 S.Ct. 306, 311 (1884). *See United States v. Clarke,* 445 U.S. 253, 255-56 n.2, 100

S.Ct. 1127, 1129 n.2 (1980). In all of the cases, however, the implied contractual obligation is founded upon constitutional requirements.

In *United States v. Great Falls Manufacturing Co.,* 112 U.S. 645, 5 S.Ct. 306 (1884), a property owner sued the United States for compensation for past and future use and occupation of his property. The government had not instituted formal condemnation proceedings. The Supreme Court considered whether, under the Tucker Act, 24 Stat. at L. 505, chap. 359, U.S. Comp. Stat. 1901, p. 752 (now 28 U.S.C.A. § 1346 & § 1491 (1978, 1981 Supp.), the Court of Claims had jurisdiction over a claim for just compensation. That Act, in pertinent part, authorized suits in the Court of Claims in cases founded upon the United States Constitution, in cases of express or implied contracts with the government, and in actions for damages in cases not sounding in tort. The question presented was whether a claim for just compensation was a claim for damages sounding in tort that could not be entertained by the Court of Claims, even though founded upon the United States Constitution. In determining that the Court of Claims had jurisdiction, the Supreme Court stated:

"It seems clear that these property rights have been held and used by the agents of the United States, under the sanction of legislative enactments by Congress; for, the appropriation of money specifically for the construction of the dam from the Maryland shore to Conn's Island was, all the circumstances considered, equivalent to an express direction by the legislative and executive branches of the government to its officers to take this particular property for the public objects contemplated by the scheme for supplying the capital of the nation with wholesome water. The making of the improvements necessarily involves the taking of the property; and if, for the want of formal proceedings for its condemnation to public use, the claimant was entitled, at the beginning of the work, to have the

agents of the government enjoined from prosecuting it until provision was made for securing, in some way, payment of the compensation required by the Constitution — upon which question we express no opinion — there is no sound reason why the claimant might not waive that right, and, electing to regard the action of the government as a taking under its sovereign right of eminent domain, demand just compensation. In that view, *we are of opinion that the United States, having by its agents, proceeding under the authority of an act of Congress, taken the property of the claimant for public use, are under an obligation, imposed by the Constitution, to make compensation. The law will imply a promise to make the required compensation, where property, to which the government asserts no title, is taken, pursuant to an act of Congress, as private property to be applied for public uses. Such an implication being consistent with the constitutional duty of the government, as well as with common justice, the claimant's cause of action is one that arises out of implied contract,* within the meaning of the statute which confers jurisdiction upon the Court of Claims of actions founded 'upon any contract, express or implied, with the government of the United States.'" *Great Falls Mfg. Co.,* 112 U.S. at 656-57, 5 S.Ct. at 310-11 (emphasis added) (citation omitted).

In *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382 (1947), suits were brought under the Tucker Act to recover the value of property claimed to have been taken by the government. There, Mr. Justice Felix Frankfurter, speaking for the Supreme Court, said:

"These suits against the Government are authorized by the Tucker Act either as claims 'founded upon the Constitution of the United States' or as arising upon implied contracts with the Govern-

ment. (See the discussion of jurisdiction both in the opinion of the Court and in the concurring opinion in United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, and in Temple v. United States, 248 U.S. 121, 39 S.Ct. 56, 63 L.Ed. 162.) But whether the theory of these suits be that there was a taking under the Fifth Amendment, and that therefore the Tucker Act may be invoked because it is a claim founded upon the Constitution, or that there was an implied promise by the Government to pay for it, is immaterial. In either event, *the claim traces back to the prohibition of the Fifth Amendment, 'nor shall private property be taken for public use, without just compensation.'* " *Dickinson,* 331 U.S. at 748, 67 S.Ct. at 1384 (emphasis added).

These cases establish that when the government takes property for public use, any implied promise or obligation to pay compensation is founded upon constitutional requirements. Courts in several states, using differing theories, reach the same conclusion. *See, e.g., Mahan v. Holifield,* 361 So.2d 1076, 1079 (Ala. 1978); *Hunter v. City of Mobile,* 244 Ala. 318, 322, 13 So.2d 656, 659 (1943); *State Highway Comm'n v. Bullard,* 208 Kan. 558, 560, 493 P. 2d 196, 199 (1972); *Eck v. City of Bismarck,* 283 N.W.2d 193, 198-99 (N.D. 1979); *Jamestown Plumbing & Heating Co. v. City of Jamestown,* 164 N.W.2d 355, 358-59 (N.D. 1968); *Jacobson v. State,* 68 N.D. 259, 261, 278 N.W. 652, 653 (1938); *Burns v. Board of Supervisors of Fairfax County,* 218 Va. 625, 627-28, 238 S.E.2d 823, 825 (1977); *Nelson County v. Loving,* 126 Va. 283, 298-301, 101 S.E. 406, 411 (1919); 30 C.J.S. *Eminent Domain* § 399 at 477-78 (1965).

Here the record shows that WCSD obtained possession of HWC's facility pursuant to the Circuit Court's 29 September 1978 order designed to protect the health, safety, and comfort of the public. Although the record contains conflicting facts and allegations concerning the issue, the question whether WCSD's act of taking possession of HWC's facility pursuant to the Circuit Court's order constituted a

"taking" in the constitutional sense was never litigated or determined.

As we noted above, not all governmental regulations affecting property result in a "taking" in the constitutional sense. When the use of property is regulated or restricted by an exercise of regulatory power not amounting to a "taking," an obligation on the part of a governmental body to pay compensation does not arise and a contract cannot be implied. However, when there is a "taking" in the constitutional sense, compensation must be paid. Thus, it is only when there is a "taking" in the constitutional sense, that an obligation on the part of a governmental body to pay compensation arises, and that a contract can be implied. In short, a determination that a taking in the constitutional sense has occurred is a prerequisite to implying a contractual obligation on the part of a governmental body.

Because here a determination that there has been a taking in the constitutional sense must be made in order to imply a contractual obligation on the part of WCSD, such an obligation cannot arise independent of constitutional requirements. For this reason, we now hold that under the circumstances here, an implied contractual obligation on the part of WCSD does not arise independent of constitutional requirements for the payment of compensation. Accordingly, the answer to the certified question is "No."

> *Question of law answered as herein set forth.*
> *Appellants to pay costs in this Court.*