554 A.2d 804

**ELECTRO–NUCLEONICS, INC.**

v.

**WASHINGTON SUBURBAN SANITARY COMMISSION.**

**No. 58, SEPT. TERM, 1988.**

Court of Appeals of Maryland.

March 13, 1989.

Motion for Reconsideration Denied May 5, 1989.

David D. Freishtat (Larry N. Gandal, Ian C. Ballon, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., on brief), Rockville, for petitioner and cross-respondent.

Wilbur D. Preston, Jr. (Richard J. Magid, William F. Ryan, Jr., Carol A. Zuckerman, Whiteford, Taylor & Preston, Baltimore, and Nathan J. Greenbaum, Robert H. Drummer, Hyattsville, on brief), for respondent and cross-petitioner.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and BLACKWELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the

Court of Appeals of Maryland (retired, Specially Assigned).

RODOWSKY, Judge.

Appellant, the owner of the fee simple estate in property adjacent to that condemned by the appellee, relies on two theories to support this inverse condemnation case. The first submission is that the appellee has taken property of the appellant in the form of the benefit of certain restrictive covenants which had burdened the condemned property. On that theory this action is barred by limitations. Appellant also submits that the appellee's use of the adjacent property effects a taking of the appellant's fee simple property, but there is no evidence to support a taking in the constitutional sense. Consequently, we shall affirm the circuit court's entry of summary judgment for the appellee.

This case is an offshoot of the litigation involved in *Washington Suburban Sanitary Comm'n v. Frankel,* 57 Md.App. 419, 470 A.2d 813 (1984), *judgment vacated on other grounds,* 302 Md. 301, 487 A.2d 651 (1985). On July 8, 1980, Washington Suburban Sanitary Commission (WSSC) acquired the fee simple title to a parcel of approximately 115 acres, known as "Site 2," in an industrial park of some 347 acres lying east of U.S. Route 29 and south of Randolph Road in Montgomery County. In litigation involving the disposition of sewage sludge generated at the District of Columbia's Blue Plains sewage treatment plant, which served part of Montgomery County, the United States District Court for the District of Columbia had ordered that a sewage sludge composting facility be located and operated at Site 2 by WSSC.

According to the terms of declarations recorded in the land records in 1956 and 1959, restrictive covenants had been imposed on the 347 acre tract. Those restrictions, in part, prohibited using any of the land for a dump or sanitary landfill, dumping of waste material or refuse, permitting waste or refuse to remain upon any part of the property outside of buildings, and emitting objectionable

odors outside of lot lines. The only defendants named in the eminent domain action by WSSC to acquire Site 2 were the owners of the parcels comprising that site. No owners of dominant estates benefited by the restrictive covenants were joined.

On November 6, 1980, WSSC filed a declaratory judgment action (*Frankel*) against identified and unidentified property owners both within and outside of the industrial park, who claimed

> "damages or payment ... or relief of any kind, purportedly stemming from the violation, abrogation, or non-observance, or the anticipated violation, abrogation or non-observance of record covenants ... or for a purported 'taking' of property rights or interests without the payment of just compensation, all stemming from the acquisition of [Site 2] for a public use."

The instant appellant, Electro–Nucleonics, Inc. (Plaintiff), has since 1971 owned Lot 6 in the industrial park. That lot is adjacent to Site 2.

In its *Frankel* opinion, the Court of Special Appeals held that the owners of property within the industrial park owned "dominant tenements with respect to the restrictive covenants to which Site 2 was subject prior to its acquisition by WSSC" and that the owners of those properties clearly had a "right to compensation by virtue of WSSC's taking of the property interest which those negative easements represent." 57 Md.App. at 435, 470 A.2d at 821. This Court vacated the mandate of the Court of Special Appeals for want of a final judgment in the trial court. We pointed out that most of the defendants in *Frankel*, anticipating a declaratory judgment adverse to WSSC's position, had counterclaimed for compensation for the taking of the covenants. Applying *East v. Gilchrist*, 293 Md. 453, 445 A.2d 343 (1982), we held that those counterclaims and the request for a declaratory judgment were one and the same claim for purposes of applying what is now Md.Rule 2–602(a). Hence certification of the declaratory judgment as a final judg-

ment was not the certification of an entire claim. This Court's *Frankel* opinion was filed February 7, 1985.

"Instead of joining the other Industrial Park owners in filing a counterclaim in the *Frankel* case, Electro–Nucleonics filed this separate action in inverse condemnation on March 27, 1986." Appellant's Brief at 1. WSSC took no issue with the Plaintiff's spin-off of its claims into this separate action. Procedurally more significant is that WSSC dismissed, without prejudice, its action for declaratory relief as to Electro–Nucleonics, Inc.[1] The relief sought in Plaintiff's separate "Complaint for Inverse Condemnation," as amended, was that a "taking be declared," that "the covenants which are described herein be condemned," and that WSSC pay to the Plaintiff $20 million "as damages for the taking of the covenants."

The two issues on which we decide this appeal were raised in summary judgment proceedings. Plaintiff, in moving for partial summary judgment as to liability, submitted that WSSC's "ownership of and activities on Site [2] violate these covenants and amount to a taking for which Plaintiff must be compensated." Plaintiff also selected the general statute of limitations as the applicable provision and argued that the cause of action accrued on or about April 25, 1983, the date indicated by certain evidence as that on which operation of the WSSC facility commenced.[2] In opposition to Plaintiff's motion, WSSC pointed out that

---

**1.** Thus, we are not presented with a case involving "[t]he rule precluding a declaratory judgment to resolve an issue when there is pending another action in which the same issue can properly be resolved[—a rule which] is neither jurisdictional nor absolute." *Haynie v. Gold Bond Bldg. Prods.*, 306 Md. 644, 652, 511 A.2d 40, 44 (1986). More generally *see Dugan v. Howard*, 130 Md. 114, 116–17, 99 A. 966, 967 (1917).

**2.** The general statute of limitations is Md.Code (1974, 1984 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article (CJ). It reads:
"A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."

under Plaintiff's theory, WSSC's ownership of Site 2, as well as WSSC's activities thereon, violated the "purported" restrictive covenants and that, under that theory, Plaintiff's cause of action necessarily accrued when WSSC gained title to Site 2 by condemnation in July 1980. WSSC has never formally moved for summary judgment in its favor on the limitations issue, but it is not necessary that WSSC have done so. *See* Md.Rule 2–501(e).

While Plaintiff's motion was pending, *Maryland Port Admin. v. QC Corp.*, 310 Md. 379, 529 A.2d 829 (1987) was decided. Relying on *QC,* WSSC moved for summary judgment in its favor on the ground that "the alleged impact of WSSC's operations at Site 2 on Electro–Nucleonics' property does not constitute a constitutionally-compensable taking of property under Maryland law." (Footnote omitted). WSSC supported its motion with the deposition of Eugene H. LaBrec, Ph.D., Corporate Director of Regulatory Affairs for the Plaintiff, who was designated as Plaintiff's deposition representative.

The circuit court granted summary judgment in favor of WSSC in a ruling from the bench. In addition to those reasons discussed in its oral ruling, the circuit court specifically granted summary judgment based on "any other reasons" which WSSC had raised. The trial judge thereby negated any possibility that he would have exercised discretion to deny summary judgment in the event his more fully articulated reasons for granting summary judgment might ultimately be legally erroneous. *Cf. Metropolitan Mortgage Fund v. Basiliko,* 288 Md. 25, 415 A.2d 582 (1980) (a trial court ordinarily possesses discretion affirmatively to deny a summary judgment in favor of a full hearing on the merits even though the technical requirements for summary judgment have been met). Here, with respect to a taking of the covenants, the circuit court concluded that "[t]he loss to the property of Electro–Nucleonics, Incorporated was in July of 1980, if at all, when the WSSC condemned [Site 2]." The court said that "the covenants no longer exist as [they apply] to the WSSC property, and [Plaintiff is] not entitled

to compensation for breach of the covenant." With respect to Plaintiff's theory that there had been a nonpossessory taking of Lot 6, the circuit court recognized that the complaint had not been based on that theory. Nevertheless, the court ruled that "there certainly is no sufficient showing to establish that the present use by WSSC [of Site 2] is causing an inverse condemnation of [Lot 6]."

We issued the writ of certiorari prior to consideration of the appeal by the Court of Special Appeals.

## I

We are able, without a detailed presentation of the facts, to dispose of Plaintiff's claim to compensation based on the taking of its property in the form of the benefit of restrictive covenants burdening Site 2. In this connection we shall assume, as Plaintiff contends, that the restrictive covenants were validly established in the industrial park, that they run with the land, and that the use made of Site 2 falls within the prohibitions of the restrictions.

In *Mercantile–Safe Deposit & Trust Co. v. Baltimore*, 308 Md. 627, 641, 521 A.2d 734, 740 (1987), we acknowledged that "the majority rule in the United States is that a restrictive covenant running with the land is a compensable property right for condemnation purposes." We had "no difficulty, therefore, in concluding that a covenant running with the land ordinarily is a compensable property interest in the condemnation context, at least to the extent it adds measurable value to the land to which it is attached." *Id.* at 641, 521 A.2d at 741. In the instant case we shall also assume that the covenants at issue added measurable value to Lot 6. Nevertheless, Plaintiff's inverse condemnation claim, based on the theory of a per se taking of a property right, is barred by limitations because, on that theory, the inverse condemnation claim accrued when WSSC acquired title by condemnation to Site 2.

On this appeal Plaintiff submits alternative reasons why instituting this action on March 27, 1986, was timely. First,

CJ § 5–101 is said to be inapplicable because it is not a special statute of limitations directly pertaining to inverse condemnation. Absent a special statute, Plaintiff submits that no time bar arises until the inverse condemnor acquires title by adverse possession. In support of this position, Plaintiff cites Annotation, *State Statute of Limitations Applicable to Inverse Condemnation or Similar Proceedings by Landowner to Obtain Compensation for Direct Appropriation of Land Without the Institution or Conclusion of Formal Proceedings Against Specific Owner,* 26 A.L.R.4th 68, 73 (1983) and 1A J. Sackman, *Nichols on Eminent Domain* § 4.102[1] (rev. 3d ed. 1985). If, on the other hand, § 5–101 does apply, then Plaintiff argues that the cause of action did not accrue until WSSC began operating the facility on Site 2, an event which Plaintiff places in April 1983. Plaintiff's legal analysis is that restrictions on Site 2 incompatible with the purpose underlying the exercise of eminent domain survived WSSC's acquisition of title and were not breached until WSSC began prohibited operations. Thus, although the Plaintiff could not by injunction prevent the prohibited operations because of their public purpose, it could at that time first claim compensation.

As we shall see below, § 5–101 is intended to establish limitations for actions based on certain constitutional violations, including violations of due process. We shall further demonstrate that, under the property theory of restrictive covenants on which this claim necessarily rests, Plaintiff's property was taken when WSSC acquired Site 2 by eminent domain.

### A

The ultimate foundation of Plaintiff's claims is constitutional. The takings clause of the fifth amendment to the United States Constitution [3] is incorporated against the states by the fourteenth amendment. *Nollan v. California*

---

**3.** "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

*Coastal Comm'n,* 483 U.S. 825, 828–829, 107 S.Ct. 3141, 3144, 97 L.Ed.2d 677, 684 (1987). The Court has also said:

> "The constitutional requirement of due process of law, which embraces compensation for private property taken for public use, applies in every case of the exertion of governmental power. If in the execution of any power, no matter what it is, the government, Federal or state, finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner."

*Chicago, Burlington, & Quincy Ry. v. Illinois,* 200 U.S. 561, 593, 26 S.Ct. 341, 350, 50 L.Ed. 596, 609 (1906).

The Maryland Declaration of Rights, art. 24 which, prior to November 7, 1978, was numbered as art. 23, provides "[t]hat no man ought to be ... deprived of his ... property, but by the judgment of his peers, or by the Law of the land." "Law of the land" is equated with due process of law. *Horace Mann League of the United States of America, Inc. v. Board of Public Works,* 242 Md. 645, 220 A.2d 51, *cert. denied,* 385 U.S. 97, 87 S.Ct. 317, 17 L.Ed.2d 195 (1966). Maryland Constitution art. III, § 40 also provides:

> "The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation."

The relationship between § 40 and art. 24 was stated in *Riden v. Philadelphia, Balt. & Wash. R.R.,* 182 Md. 336, 339–40, 35 A.2d 99, 100–01 (1943).

> "It is a fundamental principle of constitutional law that the power of eminent domain is a prerogative of sovereignty and does not require the sanction of the Constitution for its existence in the State.... The Constitution of the State of Maryland, Art. 3, Sec. 40, declares that the Legislature shall enact no law authorizing private property to be taken for public use, without just compensation as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to

such compensation. This provision is not a grant of power, but a limitation upon the exercise of power.... Keeping in mind that the rights of personal liberty and private property are held sacred in our government, and the courts never assume that the people intend to relinquish rights so vital to their security and well-being by any general grant of legislative authority or any general expression of the will of the people ..., we hold that this section of the Constitution unmistakably declares by implication that private property shall be taken only for public use and then only for just compensation, and no private property shall be taken for private use, either with or without compensation, except with the owner's consent. Moreover, the taking of a man's property for the private use of another, even with just compensation, violates Article 2[4] of the Maryland Declaration of Rights, which declares that no man ought to be deprived of his life, liberty or property but by the law of the land. Likewise, the taking of private property for private use by authority of the State is a violation of the due process clause of the Fourteenth Amendment of the Constitution of the United States.... It follows that where an undertaking for which private property is sought by condemnation is intended for private use, the property owner can invoke the aid of a court of equity to restrain the unlawful condemnation."

(Citations omitted). *See also Columbia Hills Corp. v. Mercantile Safe Deposit & Trust Co.,* 231 Md. 379, 190 A.2d 635 (1963); *Lichtenberg v. Sachs,* 213 Md. 147, 131 A.2d 264 (1957); *Easter v. Dundalk Holding Co.,* 199 Md. 303, 86 A.2d 404 (1952).

█ In the context of a claim for compensation based on an alleged taking by the State in the constitutional sense, it is immaterial for Maryland statute of limitations purposes whether the inverse condemnation claim is predicated on Maryland Constitution art. 3, § 40, on the state due process clause, on the federal fourteenth amendment, or on a combination of some or all of those constitutional

provisions. In the inverse condemnation context a statute of limitations specifically governing a claim based on any one of the constitutional provisions will govern as to a claim based on any or all of the other provisions.

Prior to Ch. 2 of the Acts of the First Special Session of 1973, which recodified certain statutes into the Courts and Judicial Proceedings Article, CJ § 5–101 was, or at least included, Md.Code (1957, 1972 Repl.Vol.), Art. 57, § 1. That section in part provided:

> "[A]ll actions for ... violation of the twenty-[fourth], twenty-sixth, thirty-first and thirty-second articles of the Declaration of Rights, or any of them, ... shall be commenced, sued or issued within three years from the time the cause of action accrued[.]"

The Revisor's Note to § 5–101, Md.Code (1974), CJ Article at 159, explains that § 5–101

> "is new language derived from Article 57, § 1. Rather than listing the various forms of action, it is decided that a blanket three-year provision, with exceptions for other limitations, be substituted."

Judge Eldridge, writing for the Court in *Widgeon v. Eastern Shore Hosp. Center,* 300 Md. 520, 479 A.2d 921 (1984), traced this history. The inclusion for more than a century in the general statute of limitations of actions based on specific articles of the Declaration of Rights supported our holding in *Widgeon* that this State recognizes a common law action for damages for violations of arts. 24 and 26 of the Maryland Declaration of Rights.

The applicability of § 5–101 is reinforced by the discussion, albeit limited, in our cases concerning the pleading of a cause of action where the theory of the case is inverse condemnation. In *Public Serv. Comm'n v. Highfield Water Co.,* 293 Md. 1, 441 A.2d 1031 (1982), a certified question case, a county sanitary district had taken possession of the property of a privately owned water company. Contemporaneously with the seizure, a circuit court enjoined the water company from interfering with the seizure. When

the water company sued in federal court, we were asked whether the sanitary district's taking of possession gave rise to an implied contract to pay the fair market value of the water company's property and, thus, gave rise to an obligation separate and distinct from any constitutional right to fair compensation based on a taking. We answered the certified question, "No," reasoning that "a determination that a taking in the constitutional sense has occurred is a prerequisite to implying a contractual obligation on the part of a governmental body." *Id.* at 20, 441 A.2d at 1040.

A taking was found to have occurred in *Walters v. Baltimore & O.R.R.*, 120 Md. 644, 88 A. 47 (1913). In response to a statutory mandate that it eliminate grade crossings at certain intersections in Baltimore City, the railroad elevated the bed of the public street and public sidewalk in front of the plaintiffs' house. The bridge, although fully on public property, passed within three inches of the front of the plaintiffs' home, effectively barred all ingress to and egress from that side of the residence and diminished light and air in the residence. The plaintiffs sued the municipality and the railroad in a declaration sounding in trespass. The plaintiffs abandoned, however, any claim of a physical invasion of the residence and rested on the theory that the elevated public street was such an invasion of the plaintiffs' rights as to amount to a taking of the residence in a constitutional sense. We described both defendants as tortfeasors and held that the plaintiffs could recover from either or both.

Utilizing as the procedural vehicle for vindicating the underlying constitutional right either an action in quasi contract (under common law pleading, an action for money had and received) or a tort action by analogy to trespass *q.c.f.* is entirely compatible with an action governed by the general three year statute of limitations.

The Court of Special Appeals has held that § 5–101 governs claims for inverse condemnation. *Millison v. Wilzack*, 77 Md.App. 676, 551 A.2d 899, *cert. denied*, 315 Md. 307, 554 A.2d 393 (1989). Couching the action in constitu-

tional terms did not, the court reasoned, change the nature of the action which remained one for damages to be measured by just compensation for the property taken.

At oral argument in this Court Plaintiff placed particular reliance on *Department of Natural Resources v. Welsh,* 308 Md. 54, 521 A.2d 313 (1986) which was said to illustrate that the statute of limitations for inverse condemnation is twenty years. *Welsh* was not an inverse condemnation case; rather, it was a bill to quiet title. The State had condemned considerable acreage on a forested mountainside in Garrett County. The description of the area taken included land owned by the plaintiff's predecessors in title who had not been joined as defendants in the condemnation suit. The State had not, therefore, acquired by condemnation the plaintiff's interest in the tract. We held that the plaintiff's bill to quiet title, brought some seventeen years after the condemnation, would lie. Implicit in *Welsh* is that the State had not acquired title to the plaintiff's land because the plaintiff had not earlier sued on an inverse condemnation theory.

Our holding that CJ § 5-101's three year period of limitations applies to inverse condemnation actions does not alter this implication in *Welsh,* or mean that an entity enjoying the power of eminent domain can acquire title to property by an uncompensated taking of three or more years duration. The three year statute of limitations simply bars the purported condemnee's remedy by way of an action predicated on the inverse condemnation theory. If there has been a taking, the right to compensation continues unless and until it is extinguished. If the facts of the taking amount to adverse possession, the condemnor will not acquire title and extinguish the right to compensation until twenty years have passed. *See* CJ § 5-103(a); *Ivy Hill Ass'n v. Kluckhuhn,* 298 Md. 695, 472 A.2d 77 (1984) (private parties). The owner whose property has been taken, but whose action for inverse condemnation is barred by limitations, may, depending on the facts, lose only the option of compelling the public authority to acquire the

property upon payment of just compensation. Even if an inverse condemnation action is barred by limitations, the owner who claims that a taking has been effected may, depending upon the facts, bring an action of ejectment, *Welsh,* 308 Md. at 65–66, 521 A.2d at 318–19, *Dunne v. State,* 162 Md. 274, 291, 159 A. 751, 758, *cert. denied,* 287 U.S. 564, 53 S.Ct. 23, 77 L.Ed. 497 (1932); or a bill to quiet title, *Welsh,* 308 Md. at 65, 521 A.2d at 318; or "the State's agencies could be restrained from appropriating the property unless and until condemnation proceedings in accordance with law be had, and just compensation awarded and paid or tendered," *Dunne,* 162 Md. at 291, 159 A. at 758; *quoted in Welsh,* 308 Md. at 65, 521 A.2d at 318.

Other than § 5–101 there is no statute addressing limitations on actions alleging a violation of art. 24 of the Declaration of Rights or of the other federal and state constitutional provisions implicated in an inverse condemnation claim. Consequently, the general three year statute of limitations found in § 5–101 controls Plaintiff's claim.

### B

Plaintiff next contends that, if § 5–101 governs limitations, the claim nevertheless arose when WSSC commenced operations on Site 2. That contention, however, is inconsistent with the right relied upon by Plaintiff. The predicate of Plaintiff's claim is that the restrictive covenant is property. Those courts and commentators who endorse that analysis, however, conceptualize the taking to occur when the condemnor acquires the property burdened by the covenant. Acquisition of the servient estate by the sovereign is said to extinguish the covenant. At that time the servient estate is no longer burdened by a restriction purporting to prohibit use of the property for the public purpose, and the owners of dominant estates no longer enjoy, and no longer can enforce, the benefit of the restriction against the formerly servient estate. Plaintiff's argument that the accrual of this inverse condemnation claim is postponed until activity takes place on the servient estate incorrectly seeks to

analogize to the situation prevailing between private parties, where, depending on the facts, the timeliness of an action to enjoin breach of a restrictive covenant might well be measured from the date when prohibited activity first occurs. That situation is not analogous to the one at hand, however, because WSSC could only exercise the power of eminent domain for a public purpose, here to use Site 2 for a sewage sludge composting facility.[4]

The American Law Institute's position, set forth in Restatement of Property § 566 (1944), supports that advocated here by WSSC. The rule in § 566 is:

"Upon a condemnation of land subject to the obligation of a promise respecting its use in such manner as to extinguish the interest in the land created by the promise, compensation must be made to those entitled to the benefit of the promise."

Comment *b* further explains:

"*Equitable interest in land.* To the extent to which a promise respecting the use of land of the promisor may be enforced by injunction, the promise creates an equitable interest in the land respecting the use of which the promise is made. Upon condemnation of the land for a purpose inconsistent with the continuance of the promised use, the rights constituting this equitable interest are included in the condemnation and the owner of them is entitled to compensation for their taking."

---

**4.** We do not imply that the timeliness of the counterclaims for compensation filed by the defendants in WSSC's declaratory judgment action (*Frankel*) is to be measured from the date of taking of Site 2. The Maryland Uniform Declaratory Judgments Act, in CJ § 3–412, specifically provides:

"(a) *Further relief.*—Further relief based on a declaratory judgment or decree may be granted if necessary or proper.

(b) *Application.*—An application for further relief shall be by petition to a court having jurisdiction to grant the relief."

Thus, in lieu of counterclaiming, the counterclaimants in *Frankel* could have awaited the final declaratory decree and, if it were adverse to WSSC, could have then sought just compensation in the declaratory judgment action or commenced separate actions for relief based on that judgment.

2 *Nichols on Eminent Domain, supra,* § 5.15[1] summarizes the majority view by stating that restrictive covenants "constitute equitable easements in the land restricted, and when such land is taken for a public use that will violate the restrictions, there is a taking of the property of the owners of the land for the benefit of which the restrictions were imposed." Stoebuck, *Condemnation of Rights the Condemnee Holds in Lands of Another,* 56 Iowa L.Rev. 293, 301–02 (1970) gives the following illustration of the conventional analysis:

> "By way of example, *A,* owner of the benefited parcel, may have the right that *B,* owner of the burdened parcel, shall use his land for no purpose other than for a single-family dwelling....: *A* 's loss occurs when an entity having the power of eminent domain acquires *B* 's land for use in some way that violates the restrictive covenant —in the example stated, perhaps, for a sewage disposal plant. Since *A* cannot enjoin the public entity, as he might a private owner of *B* 's land, his contention will be that his covenantal right has been extinguished and taken."

*See also* 2 American Law of Property § 9.40, at 449 (1952).

■ We have not been cited to, nor found, any case specifically deciding when limitations begin to run against an inverse condemnation action based on the loss of the benefit of a restrictive covenant. The following cases, however, support our conclusion that limitations begin to run when the servient estate is taken for a purpose inconsistent with the covenant, because these cases consider the covenant to be destroyed, or extinguished, when the servient estate is condemned. *See Adaman Mut. Water Co. v. United States,* 278 F.2d 842 (9th Cir.1960); *United States v. Certain Land in Augusta,* 220 F.Supp. 696 (D.Me.1963); *Town of Stamford v. Vuono,* 108 Conn. 359, 143 A. 245 (1928); *Allen v. City of Detroit,* 167 Mich. 464, 133 N.W. 317 (1911); *Horst v. Housing Auth.,* 184 Neb. 215, 166 N.W.2d 119 (1969); *Meredith v. Washoe County School Dist.,* 84 Nev. 15, 435 P.2d 750 (1968); *City of Raleigh v.*

*Edwards,* 235 N.C. 671, 71 S.E.2d 396 (1952); *City of Shelbyville v. Kilpatrick,* 204 Tenn. 484, 322 S.W.2d 203 (1959); *City of Houston v. McCarthy,* 464 S.W.2d 381 (Tex.Civ.App.1971).

Accordingly, we hold that Plaintiff's per se taking claim is barred by limitations.

## II

■ On its second claim, that the use made by WSSC of Site 2 effects a nonpossessory taking of Lot 6, Plaintiff submits that this record contains sufficient evidence to withstand WSSC's motion for summary judgment.[5] The argument is that pollution created by WSSC significantly impaired Plaintiff's ability to manufacture biomedical products. We do not find evidence of a significant impairment and consequently do not reach the question whether significantly impairing the conduct of a particular business on Lot 6 would effect a taking of Lot 6.

The process conducted at Site 2 by WSSC is described in a report of February, 1987, prepared by the Johns Hopkins University School of Hygiene and Public Health (JHU) for the Maryland Department of Health and Mental Hygiene.

"Dewatered sludge containing about 15–20% solids and 80–85% moisture is delivered to the facility daily in watertight dump trucks. The sludge is mixed with wood chips to obtain a combined moisture content of approximately 60%. The wood chips act as the source of organic carbon in the composting process and provide the porosity necessary for aeration. Front-end loaders are used to construct continuous static composting piles on concrete composting pads. Each pad can accommodate up to 28 continuous piles, with each pile approximately 20 feet wide, 100 feet long and 12 feet high. Primary composting operations were initially conducted under a roofed, open-

---

5. Plaintiff does not argue that the trial court entered summary judgment without affording Plaintiff a reasonable opportunity to obtain any available evidence.

sided structure. In June 1986 the sludge curing operations were moved to this area. In June 1986 fabric sides were added to this structure to help control odor release; no portion of the composting operations has been conducted in the open air since this date.

"To construct a composting pile, an initial layer of wood chips is placed directly over laterally-arranged perforated aeration pipes. These pipes are connected to vacuum blowers and a centralized air collection system. The sludge/wood chip mixture is then placed on top of the wood chip bed and aerated by drawing air through the piles utilizing blowers which are designed to provide up to 3,000 cubic feet of air per hour per dry ton of sludge for a 21–day period. The operation of each vacuum blower is regulated by a temperature monitoring probe in order to ensure temperature control, oxygen penetration and rapid aerobic decomposition, while minimizing odor production. Much of the odorous gases produced in the piles during the composting process [is] withdrawn by the vacuum blowers into the centralized air collection system, passed through an odor scrubbing system and discharged through a 65–foot stack into the atmosphere....

"After the 21–day composting period, the piles are torn down, mechanically restacked and aerated by blowers to further reduce moisture content and ease screening of the materials. Restacked piles normally remain on the pad for four to six days. After the restacking operation, the compost/wood chip mixture is transported to an enclosed screening building where the reusable wood chips are separated from the compost material. Screened compost is then returned to the pad for a minimum 30–day curing period during which blowers aerate piles under positive pressure. The final compost product is sold for agricultural and horticultural use."

Record Extract at 140, 143–44.

On Lot 6 Plaintiff produces virus components for diagnostic test kits. Plaintiff had purchased Lot 6, and the improvements then on it, in October 1971. Those improve-

ments were gutted and a containment facility was built, consisting of three separate laboratories, in which the viruses are cultivated. The viruses are grown at negative pressure, that is, at a pressure less than atmospheric pressure, in order to contain the viruses within the laboratories and not to subject the environment to them.

Plaintiff's concern with WSSC's use of Site 2 is that, despite precautions, the negative pressure of the containment area will draw into one or more laboratories whatever the outside atmosphere contains. That may be a contaminant which destroys the production of the viruses to the serious financial detriment of Plaintiff. The cultures could become contaminated by what Plaintiff calls "bioburden," meaning spores and bacteria. Plaintiff's apprehension is that WSSC's adjacent sewage sludge composting facility increases the preexisting ambient bioburden and increases the risk of contamination.[6] Plaintiff is particularly apprehensive that the bioburden will be beyond its control if and when WSSC increases operations to the ultimate capacity of Site 2 of 600 tons per day from the present level of 200 tons per day.

To minimize the risk of contamination, each laboratory, *i.e.,* each production line, was built with a separate air system. Air drawn into the laboratory is filtered through high efficiency particulate air (HEPA) filters which screen out particles down to three-tenths of a micron at ninety-nine percent efficiency. The exhaust which is discharged from the building is also HEPA filtered. Plaintiff changes the air in each laboratory twenty times per hour, because of the

---

**6.** Although the record is laden with evidence that persons in the neighborhood have complained concerning the odor emanating from the WSSC facility, particularly when the facility first began operations, Dr. LeBrec testified on behalf of Plaintiff that "[o]dors will have no economic impact to our company, absolutely none, because we don't sell from this plant[.] [A]ll this plant is is a manufacturing site that makes a raw material for another site. And so, obviously, odor has no economic impact. Bioburden could."

proximity of WSSC's facility, even though the recommended rate is ten times per hour.

A person who desires to enter a laboratory from an ambient air section of Plaintiff's building must first enter a dressing facility, which is the first negative pressure gradient, where that person changes clothes and gowns. That person then passes through a hallway, which is the next lower negative pressure gradient, before entering a laboratory. The laboratories are maintained at still a lower pressure of .3 to .5 inch water gauge. Plaintiff has been considering building positive pressure chambers, or airlocks, at the outside entrances to its building, but has not done so.

From 1972 to 1984 Plaintiff's facility at Lot 6 primarily had grown viruses for use in tests for hepatitis. Since 1984 approximately eighty percent of production is the human immunodeficiency virus (HIV). HIV cultures are continuously harvested on almost a daily basis. The virus is inactivated, tested for quality, and then shipped to another location where the virus is incorporated into a test for HIV antibodies. The test is used to screen blood at blood banks and any facility that draws human blood.[7]

Plaintiff has been unable to build up an inventory of the HIV test kits, primarily because the demand for these blood screening kits is so great. Plaintiff's fear is that the cultures in one or more laboratories will be contaminated and the entire production then under cultivation lost. The concern is that if the Plaintiff is unable to supply customers because production has been interrupted by contamination, the customers will immediately go to other sources and Plaintiff will be put out of business.

On the present record, Plaintiff continues to do business at Lot 6. There is no evidence that it has ever had to close

---

7. The remaining twenty percent of Plaintiff's production is considered proprietary information and it was not disclosed in the record.

down one of the production lines, or part of one of the lines, due to contamination. Although Plaintiff has a constant program of quality control, there is no evidence that Plaintiff has ever discovered in any of its cultures or, indeed, anywhere in its building, any contaminant which the Plaintiff has been able to trace to the operations at Site 2.

On the other hand, the JHU study sought to determine, in part, the environmental impact of bacteria and fungi released by the composting operation. JHU concentrated its investigation on a common fungus, *Aspergillus fumigatus*, because it is known to occur in large numbers in composting operations. The study found that the concentrations were within normal range.[8]

*Maryland Port Admin. v. QC Corp.*, 310 Md. 379, 529 A.2d 829, presented a very similar claim of inverse condemnation. In that case we affirmed a judgment entered by a court as a matter of law for the defendant, notwithstanding the verdict of the jury had been in favor of the plaintiff. That plaintiff had proven that, to some degree, carcinogens were carried in the ambient air from the State's adjacent hazardous waste dumps onto the property where the plaintiff had processed chemicals and, later, packaged for resale chemicals purchased from others. There was, however, no evidence that occupational health standards then in effect were exceeded. In the instant case there is, at best from the Plaintiff's standpoint, a comparable deficiency in evidence of a taking due to ambient bioburden at this time.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.

---

**8.** The normal background concentrations of *Aspergillus fumigatus* are considered to be zero to five hundred colony forming units per cubic meter of air ($cfu/m^3$). The geometric mean ambient concentration in the communities surrounding Site 2 was 3.4 $cfu/m^3$ and the maximum concentration there was 88 $cfu/m^3$. The highest concentration detected on Site 2 was 144 $cfu/m^3$.